E. Russell JONES, Executor of the Estate
of Alexia duPont Ortiz deBie,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 3015.

United States District Court
D. Delaware.

Jan. 26, 1968.

Howard L. Williams, of Morris, James, Hitchens & Williams, Wilmington, Del., for plaintiff.

Alexander Greenfield, U. S. Atty., and Mitchell Rogovin, Asst. Atty. Gen., Donald R. Anderson, Herbert Grossman, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

STEEL, District Judge.

This is an action by the executor of the estate of Alexia duPont Ortiz deBie to recover income taxes which plaintiff contends were erroneously paid by taxpayer and illegally retained by defendant. By agreement the action was tried without a jury. The Court has jurisdiction of the parties and of the subject matter of the action. 28 U.S.C. § 1346(a) (1).

### Background Facts

After the taxpayer filed her income tax returns for 1955 and 1956 and paid the taxes shown to be due thereon, the Government served a notice upon her alleging deficiencies of $32,101.24 for 1955 and $38,582.87 for 1956. On July 27, 1962 the taxpayer paid these amounts with interest, and on July 3, 1963 the plaintiff filed claims for refund of $31,106.72 for 1955 and $50,916.87 for 1956.[1] These were disallowed by the Government.

In 1940 the taxpayer inherited from her mother certain improved real property, subject to curtesy (life) interest in her father, Julian Ortiz. The latter died in 1955. The property in which he had a curtesy interest consisted of two tracts, one of which was referred to as "Valmy". This contained a 30 room residence (hereinafter the "mansion"). The other tract consisted of buildings accessory to the mansion which were partly occupied by tenants.

Between 1940 when taxpayer's mother died, and May 5, 1955, when taxpayer's father died, no maintenance, repairs, or improvements were made on the exterior or interior of the mansion and it fell into disrepair.

During the years 1955 and 1956, the taxpayer expended large amounts of money on the mansion. For 1955 she claimed as a deduction in her income tax return, "repairs to rental property" of $20,228.35. The Commissioner disallowed $19,308.48 which he asserted was spent on the mansion as well as $3,000 depreciation claimed by the taxpayer on the mansion for 1955.

For 1956 the taxpayer claimed deductions for repairs on the mansion of $35,667.52 and depreciation deductions on the mansion of $4,500.00. The Commissioner disallowed both of these items.

### Discussion

Broadly speaking, the question presented (apart from depreciation and a repair to two roads) is whether the payments which taxpayer made in connection with the mansion in 1955 and 1956 should be treated as tax deductible expenses or as non-deductible capital improvements. This question must be resolved under the Internal Revenue Code of 1954, as amended. Two sections, Int.Rev.Code of 1954, §§ 212, 263, are relevant.

Section 212 provides in pertinent part:

## "EXPENSES FOR PRODUCTION OF INCOME

In the case of an individual, there shall be allowed as a deduction all the

---

[1]. The disparity between the deficiencies and the refunds claimed is not material for present purposes.

ordinary and necessary expenses paid or incurred during the taxable year—

> (1) for the production or collection of income;
>
> (2) for the management, conservation, or maintenance of property held for the production of income * * *."

Section 263, as it bears upon the problem, reads:

### "CAPITAL EXPENDITURES

(a) *General Rule.* No deduction shall be allowed for—

> (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate.
>
> \* \* \* \* \* \*
>
> (2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made."

Deductibility under Int.Rev.Code of 1954, § 212 depends upon two key factors: (1) the expenditures must be for the "production of income," either directly, or for the management, conservation or maintenance of property held to that end, and (2) the expenditures must be "ordinary and necessary".

Plaintiff contends that the first test has been met since the expenditures in issue were made upon the mansion which the taxpayer intended to rent. The evidence is clear that the taxpayer never lived in the mansion and had no intention of doing so. It is likewise uncontroverted that the mansion was never rented.

The question whether one intends to rent property is essentially subjective. William C. Horrmann v. Comm'r, 17 T.C. 903 (1951). Since taxpayer died in 1963, the Court did not have the benefit of her testimony. Plaintiff, the financial advisor to the taxpayer for many years, testified that she repeatedly told him of her desire to rent the mansion. Obviously, this testimony was hearsay, and while there is no reason to doubt plaintiff's veracity, the taxpayer's statements to plaintiff were likewise self-serving.

Of more evidentiary importance is the testimony of plaintiff and Tingle, an employee of the real estate firm of Emmett S. Hickman Company, concerning the efforts which were actually made to obtain tenants for the mansion. Their testimony in this regard is not in dispute.

Tingle testified that, although in the summer of 1956 he had discussed with plaintiff the possibility of renting the mansion, it was not fit to rent at that time. It was not until after the renovation of the mansion had been completed in the latter part of 1956, that plaintiff asked Emmett S. Hickman Company to try to lease it. The mansion was then advertised twice a week in the Wilmington Morning News from January 2, 1957 to February 5, 1957. The taxpayer never accepted Hickman's recommendation that there be more extensive advertising in out-of-state publications. Despite the cessation of advertising in early February of 1957, the property was not taken off the market by Hickman until two or three months beyond March of 1957.

In addition to advertising, Emmett S. Hickman Company listed the mansion with the real estate department of E. I. duPont de Nemours and Company, which assisted employees in finding places to live, and several local churches.

As a result of these efforts Tingle had inquiries from several private schools. One of them actually inspected the mansion. It was also shown to an individual, but he was not interested because of his inability to rent the surrounding cottages.

On December 27, 1957 the taxpayer conveyed the mansion and 7.37 acres of land to Psycho Synthesis Research Foundation, a charitable foundation, and valued the mansion at $97,000 for tax purposes. This value had been arrived at on April 22, 1957 by the Wilmington Real Estate Board, Inc., of which Tingle was Chairman of the Appraisal Committee. Taxpayer had requested that this appraisal be made 30 to 60 days before it was made.

Prior to making the expenditures in dispute, taxpayer did not estimate their amount or the potential rental income. The fair rental income ultimately proposed by Emmett S. Hickman Company was $350.00 per month, plus an obligation on the tenant's part to maintain the property and pay for the heat and utilities. Insurance and taxes were to be paid by taxpayer.

■ The fact that the mansion was never rented does not of itself deprive the expenditures of their deductibility. The statute does not require that property be actually rented, but only that it be held for rental. Mary Laughlin Robinson v. Comm'r, 2 T.C. 305 (1943). The critical question is whether the efforts which were made to rent the mansion were bona fide, or merely a sham to provide a basis for a tax deduction. 4A Mertens, Law of Federal Income Taxation § 25A.08 (1966). This is a factual question of considerable difficulty.

The fact that taxpayer made no attempt to forecast her expenditures and estimate the potential rental income in advance of embarking upon the renovation program might perhaps, in normal circumstances, make suspect the claim of a rental purpose. But the instant case is not the usual one. Taxpayer was an extremely wealthy woman. She was generally disinclined to sell any of her real estate holdings because she had faith that over the long term they would enhance in value. This could well have justified her desire to have the mansion occupied and not vacant, and to minimize her carrying charges while the mansion was being held. The listing of the mansion for rental with Emmett S. Hickman Company, the duPont Company real estate department, and the churches, supports the seriousness of taxpayer's determination to rent the mansion.

Even so, these considerations are weakened by the fact that the advertising efforts were short-lived and not as extensive as the more widespread advertising which Emmett S. Hickman Company had recommended. Furthermore, taxpayer must have known that persons interested in renting the mansion would at best be few and far between. Even after the renovation, the toilet facilities dated back to 1905, the kitchen was antiquated, the traffic pattern was poor, and in general the property suffered from functional and economic obsolescence. It is only the rarest of persons today who would want to rent a 30 room mansion, particularly under the year to year lease Tingle stated would have been required. For a family the mansion was a "white elephant".

The Wilmington Real Estate Board, Inc., which appraised the mansion on April 22, 1957, stated that its highest and best use was for institutional purposes, i. e., private school, convalescent home. Under the prevailing zoning ordinance, however, such a use was not permissible. Although the appraisers felt the Zoning Commission might give favorable consideration to rezoning, that was far from assured.

It is at least a fair inference that the appraisal, which the taxpayer directed in February or March of 1957, was designed to establish a tax value for a charitable gift which the taxpayer then had in contemplation, and which was in fact made at the end of 1957. Of course, the mere fact that the gift was made does not establish that the rental efforts were spurious. Nevertheless, the proximity in time of the rental activities, the appraisal, and the gift, together with the other circumstances previously alluded to, cast doubt upon the good faith of the attempt which the taxpayer made to find a tenant. Furthermore, if an individual or institution should have appeared ready and willing to lease the mansion, the taxpayer always had an "out". By the reservation contained in her advertisement, a prospect had to be "approved" by taxpayer. No unqualified authority was granted to Emmett S. Hickman Company to rent the mansion.

■ As noted at the beginning of this discussion, the question whether the mansion was being held for rental purposes is not free from doubt. It is settled that there is a presumption of validity to a

tax determination by the Commissioner. In his deficiency notice the Commissioner stated that the expenses presently in issue were disallowed because the taxpayer failed to establish that the mansion had been held for the production of income. The burden rests upon the plaintiff to upset this determination. On the issue under discussion, plaintiff failed to carry this burden.

■ This, without more, would necessitate the disallowance of all the deductions in issue,[2] including that of depreciation. A condition for the allowance of depreciation is that property either be used in the trade or business of the taxpayer (inapplicable here), or that the property be held for the production of income. Int.Rev.Code of 1954, § 167. As stated, plaintiff failed to carry the burden of establishing error on the part of the Commissioner in determining that the mansion was not held for the production of income.

■ Even if it be assumed, *arguendo*, that the mansion was in fact held for the production of rental income, the claimed deductions were properly disallowed. The test whether or not a restoration of property is deductible as an expense or must be capitalized and depreciated is stated in Estate of Walling v. Commissioner of Internal Revenue, 373 F.2d 190, 192–193 (3rd Cir. 1967). There the Court said:

> "The test which normally is to be applied is that if the improvements were made to 'put' the particular capital asset in efficient operating condition, then they are capital in nature. If, however, they were made merely to 'keep' the asset in efficient operating condition, then they are repairs and are deductible. Stoeltzing v. CIR, 266 F.2d 374, 376 (C.A.3, 1959)."

The Court later referred to this criterion as the "put-keep" distinction.[3]

■ The evidence at bar demonstrates that the expenditures made in connection with the mansion were essential to "put" it in rentable condition and were not made to "keep" it in that condition. Plaintiff testified that prior to the renovation of the mansion "no one would want [to rent] the house". Similarly, on January 24, 1959, plaintiff, on behalf of the taxpayer, wrote the Director of Internal Revenue about taxpayer's 1956 return:

> "The work done was absolutely necessary before it [the mansion] was offered for rent inasmuch as nothing had been done whatever on the property for a period of 18–20 years and therefore in such a condition [*sic*], from an appearance standpoint, that no prospective customer would even wish to look at the property."

In Stoeltzing v. Commissioner of Internal Revenue, 266 F.2d 374 (3rd Cir. 1959), as in *Estate of Walling*, supra, the Court sustained the Commissioner's disallowance of expenses for rehabilitating, reconditioning and reconverting a building for commercial improvements. In doing so, it relied in part on Treas. Reg. 118, § 39.23(a)–4 (1953) which reads:

> "The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures."

2. The only exception to this statement is the item of road repairs amounting to $4,589.26 which the Commissioner disallowed. This specific item is subject to later discussion in this opinion.

3. The Court in *Estate of Walling* dealt with a "trade or business" expense under Int.Rev.Code of 1954, § 162. In en-

acting Section 212, Congress intended to provide a class of non-business deductions coextensive with the deductions under Section 162. Bingham's Trust v. Commissioner of Internal Revenue, 325 U.S. 365, C5 S.Ct. 1232, 89 L.Ed. 1670 (1945). The words "ordinary and necessary" in Section 212 have, therefore, the same meaning as in Section 162.

[Presently Treas.Reg. § 1.162–4 (1955).]

The Court held that the expenditures were not for "incidental repairs" as defined in the Regulation.

This is likewise true in the instant case. In the taxpayer's letter of January 24, 1959 relating to her 1956 return, she detailed the work which had been done as follows:

| | |
|---|---|
| "(1) Plastering & Masonry (Pauls Plastering Co.) | $ 8,392.90 |
| (2) Carpentry (Oat & Timko) | 6,101.90 |
| (3) Painting (R. J. Peoples Co. & Austin T. Peoples) | 16,149.58 |
| (4) Plumbing (A. Ralph Woodrow) | 61.65 |
| (5) Papering (Ingve Gustafson) | 346.65 |
| (6) Fuel Oil (Sun Oil Company) | 1,939.75 |
| (7) Rental Expense (Emmett S. Hickman Co.) | 120.00 |
| (8) Furnace Expense (Alex H. McDaniel Co.) | 31.14 |
| (9) Maintenance Material (Miscl.) (Brosius & Smedley & Shields Lbr. Co.) | 216.81 |
| (10) Labor Repairs | 404.34 |
| (11) Electric Repairs | 7.50 |
| (12) Miscellaneous Expense | 462.35 |
| Total | $34,234.57 |

Item (1) covered miscellaneous Carpenter repairs.

Item (12) covered—principally—general house cleaning after the repair work was completed.

As noted, items 1, 2, 3 cover practically the entire amount expended.

*Plastering and Masonry* covered strictly areas of repairs where ceilings and walls—inside the house—had become cracked, due, in some cases, to damage done a few years ago when the piping in the house froze during the winter and burst, causeing [*sic*] considerable damage to the plastered ceilings and walls. They had never been repaired. The principal damage *outside* was on one of sidewalls to the kitchen area. A stucco type of construction. [*sic*] Water had penetrated into the sidewall due to leakage of some very bad spouting and gutter. (roof) The particular sidewall had buckled so bad [*sic*] that shutter etc. were merely hanging from the wall.

*Carpenter* work was necessary in connection with the repair to the wall mentioned above. Repairs to window sills, door sills and [*sic*] door frames. The lack of any paint whatever, either inside or outside the house in *over 20 years*, is surely evident [*sic*] that any woodwork would deteriorate.

*Painting* covered inside as well as outside of the house. The fact that no painting whatever had been done, as mentioned above, for over 20 years required considerable time and labor."

In 1955 the expenditures which were allocable to the mansion were made up as follows:

| "Plumbing | $ 2,168.60 |
| Painting | 5,350.00 |
| Plastering | 652.00 |
| Road repairs | 4,589.26 |
| Carpenter | 4,713.92 |
| Spouting and roof | 2,183.23 |
| Total | $19,657.01" [4] |

In view of the fact that the mansion was appraised at $97,000.00 as of April 22, 1957, after renovation, the expenses allocable to the mansion in 1955 and 1956 here in issue were not incidental. The amounts expended added to the value of the property and appreciably prolonged its life. By the terms of Treas.Reg. § 1.162–4 (1955) they are not deductible.

■ Plaintiff points out that among the largest expenses were plastering and painting, and cites decisions which hold that these items are deductible. *Stoeltzing*, supra, dealt with a comparable problem. The Court there noted that if the expenditures for each item were considered individually and without relationship to other items, it might be correct to classify some of them as deductible. The Court concluded, however, that since the specific items were an integral part of an entire improvement project, they should not be considered separately but looked upon as part of the whole. This is true in the instant action.

■ Nor can the expenditures which the taxpayer made be deemed "ordinary" as Int.Rev.Code of 1954, § 212 mandates as a condition of deductibility. Admittedly, the line of demarcation between an ordinary and an extraordinary expenditure within the meaning of the statute is frequently one of degree. No verbal formula will provide the litmus test. Life as it is experienced must furnish the answer. Compare, Welch v. Helvering, 290 U.S. 111, 114–115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

In the normal course of events when property held for income producing purposes is to be improved, an owner will weigh the amount of his proposed expenditures against his anticipated income from the property. Only in rare instances will a property owner be indifferent to the economic consequence of the expenditures. The fact that taxpayer was willing to renovate without regard to this relationship is an indication that the expenses claimed to be deductible were not "ordinary". An additional confirmation of the extraordinary character of the expenses is the relatively large amount of outlays in relation to what must have been the value of the mansion before its renovation. Compare, Stoeltzing v. Commissioner of Internal Revenue, supra, 266 F.2d at 376.

■ One of the deductions which the Commissioner disallowed was "road repairs $4,589.26". This expenditure was for repairing each of two existing roads on premises in the vicinity of the mansion. One road led from Hillside Road to the farmer's house; the other from Hillside Road to a group of tenant houses.[5] Both the farmer's house and the tenant houses were rented. The Commissioner concedes that they were held for the production of income under Int.Rev.Code of 1954, § 212. The expenditure was not for the construction of new roads. Had it been, there might be force to the Commissioner's contention that the expenses should be capitalized and then depreciated. Since the work was necessary to keep pre-existing roads leading to and from rental properties in satisfactory traversable condition, the disallowance of the deduction was

4. The disparity between this total of $19,-657.01 and the $19,308.43 allocated by the collector to the mansion amounts to $348.58. This does not appear to be explained.

5. It is not important that this road also comprised a part of the service entrance to the mansion. The road from the main entrance to the mansion had never been paved. The repair to the portion of the service entrance was essential to provide the tenants with appropriate ingress and egress to their homes.

not proper, regardless of how other expenses incident to the mansion are treated. See, The Pennock Plantation, Inc., Par. 51,341 P–H Memo TC (1951).

It is not significant that taxpayer in her income tax return for 1959 showed the expense of repairing the roads on a depreciation schedule and indicated that the roads had a life of five years. This treatment was obviously a precautionary step which the taxpayer had taken because the Commissioner in his examination of the return for 1955 had indicated an intention to disallow the road repair item as an expense. More significant is the fact that the returns filed for 1955, 1956 and 1957 treated the expenditures as an expense consistently with the plaintiff's present contention.

If the mansion (contrary to the views previously expressed) had been held for rental purposes from May 5, 1955 through December 31, 1956, depreciation would be allowable under Int.Rev.Code of 1954, § 167. On this assumption the taxpayer claimed $3,000 for 1955 and $4,500 for 1956; whereas the Commissioner contends, upon the basis of the same assumption, that for 1955 and 1956 the depreciation should be only $830.45 and $3,748.79, respectively.

The taxpayer's computation of depreciation was based upon an assumed valuation of $90,000 as of May 5, 1955 and an assumed life of the mansion of twenty years. No appraisal of the mansion was ever made on or reasonably near May 5, 1955. The $90,000 used as the depreciation base was the value allocated to the mansion in 1940 when the mother of the taxpayer died. Plaintiff testified that this figure was supplied by a Mr. Campbell who was an accountant for Mr. Ortiz after the death of his first wife. In so far as the $90,000 figure is concerned, it is clearly hearsay. The appraisal closest in point of time to May 5, 1955 is that of April 22, 1957. Then, after extensive and expensive renovations had been made, the mansion was appraised at $97,000.

A taxpayer who seeks a deduction has the burden of providing the support for it. The record fails to contain any acceptable evidence to support the depreciation base of $90,000 which taxpayer used.

Nevertheless, if a reviewing Court should hold (contrary to the views herein expressed) that from May 5, 1955 until December 31, 1956 the mansion was held for rental purposes, then it would appear appropriate to allow as a depreciation deduction, $830.45 for 1955 and $3,748.79 for 1956, the amounts the Commissioner concedes should be allowed.

Initially, this litigation involved deductions in addition to those discussed in this opinion. In the pre-trial order and in his brief, the Commissioner conceded the right of plaintiff to take these additional deductions. The judgment submitted should, therefore, reflect these concessions.

Let a judgment be submitted consistent with this opinion.