24 *United Dairy Farmers, et al. v. United States*     No. 00-3800

## CONCLUSION

For the above reasons, we **AFFIRM** the district court's order dismissing UDF's claims brought pursuant to 26 U.S.C. § 6226(e) for readjustment of the IRS determination disallowing several corporate income tax deductions taken by UDF in 1993 under §§ 162 and 165(a).

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0352P (6th Cir.)
File Name: 01a0352p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED DAIRY FARMERS, INC., et al.,

    *Plaintiffs-Appellants,*

*v.*

UNITED STATES OF AMERICA,

    *Defendant-Appellee.*

No. 00-3800

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 97-01043—Sandra S. Beckwith, District Judge.

Argued: August 2, 2001

Decided and Filed: October 3, 2001

Before: CLAY and GILMAN, Circuit Judges; WISEMAN, District Judge.*

_____

*The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

_____

## COUNSEL

**ARGUED:** Stephen M. Nechemias, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellants. Thomas J. Sawyer, UNITED STATES DEPARTMENT OF JUSTICE, TAX DIVISION, Washington, D.C., for Appellee. **ON BRIEF:** Stephen M. Nechemias, J. Donald Mottley, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellants. Thomas J. Sawyer, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, TAX DIVISION, Washington, D.C., for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. Plaintiffs, United Dairy Farmers, Inc. *et al.* ("UDF"), appeal from the district's court order dismissing UDF's claims brought pursuant to 26 U.S.C. § 6226(e), for readjustment of the Internal Revenue Service ("IRS") determination disallowing several corporate income tax deductions taken by UDF in 1993 under 26 U.S.C. §§ 162 and 165(a) of the Internal Revenue Code ("the Code"). We **AFFIRM**.

## BACKGROUND

### Procedural History

On July 25, 1994, UDF filed a federal income tax return for its 1993 taxable year, claiming several deductions for ordinary business expenses pursuant to § 162, and abandonment losses pursuant to § 165, of the Code. On June 27, 1997, the IRS issued a Notice of Final S Corporation Administrative Adjustment disallowing some of these deductions from UDF's ordinary income. On November 21, 1997, UDF paid $7,744 to the IRS, the amount by which the adjustments

could have selected and acted in accordance with more than one. *Id*. at 110.

At issue in *Nicolazzi* was a lottery program in which participants completed multiple lease applications, with the expectation of acquiring at least one lease, and the hope of acquiring more than one. The taxpayer in *Nicolazzi* argued that each lease application was an independent transaction under § 165, an thus the costs of each unsuccessful lease application could be deducted. The tax court in *Nicolazzi* rejected this argument, finding that "the relevant transaction is [the taxpayer's] investment in the [lottery] program, and the determination of whether [taxpayer] sustained a loss on that transaction must be based on overall program performance measured by reference to the aggregate of the lease applications." *Nicolazzi*, 79 T.C. at 131.

UDF argues that its payments to Hixson in connection with the plan to select a cite for its Cincinnati distribution center were more analogous to *Sibley*, which found deductible abandonment costs under § 165, than to *Nicolazzi*, which did not find deductible abandonment costs under § 165. However, UDF intended to select only one site for its Cincinnati facility. This fact is directly contrary to *Sibley*, where the taxpayer could have accepted "all or any" of the multiple plans presented. *Sibley*, 15 T.C. at 110. Further, as in *Nicolazzi*, the relevant "transaction" concerned UDF's interest in finding an acceptable site, somewhere, for its Cincinnati distribution center, rather than UDF's interest in any particular site. We find that the district court did not err when finding, under *Nicolazzi*, that UDF's Hixson payments were part of an overall plan to find a site for its Cincinnati distribution center.

studies. *Corra Res.*, 945 F.2d at 225. That is, even assuming the engineering studies had become worthless, whether objectively or subjectively, UDF cannot deduct an abandonment loss under § 165 without an identifiable event irrevocably cutting ties to the studies. The court found that the decision to construct the Erlanger facility was not such an identifiable event. UDF has not challenged this finding. Moreover, the district court expressly doubted UDF's subjective belief in the worthlessness of the studies, given that UDF's "abandonment" of the CIP system studies from the mid-1980's to the mid-1990's was then followed by a new CIP system study implemented soon after taking the abandonment loss deduction. In light of such conduct, the district court noted that UDF's subjective concept of abandonment appeared to be "transitory in nature." *United Dairy Farmers*, 107 F. Supp. at 946. We find that even a subjective standard of worthlessness would be unavailing for UDF.

### 2. Hixson Payments/Overall Plan

UDF contends that under *Sibley, Lindsay & Curr v. Commissioner of Internal Revenue*, 15 T.C. 106, 110 (1950), the Hixson payments attributable to costs relating to alternatives that were not implemented were deductible. UDF also distinguishes *Nicolazzi v. Commissioner of Internal Revenue*, 79 T.C. 109 (1982), on which the district court relied, arguing that *Nicolazzi* does not apply where a taxpayer had the option of choosing one study to the exclusion of other studies.

The tax court in *Sibley* distinguished mutually exclusive "alternative plans," only one of which a taxpayer may select and act in accordance with, from multiple "suggestions" falling under one plan, one or more of which a taxpayer may select and act in accordance with. *Sibley*, 15 T.C. at 110. As noted by the district court, under *Sibley*, a taxpayer may deduct under § 165 the costs of unpursued plans only if those plans were not mutually exclusive, i.e., only if the taxpayer

increased UDF's tax liability, and filed a petition for readjustment pursuant to 26 U.S.C. § 6226(e) to refund the payment. On May 23, 2000, following a two-day bench trial, the district court entered judgment in favor of the government. *See United Dairy Farmers v. United States*, 107 F.Supp.2d 937, 949 (S.D. Ohio 2000). UDF now appeals.

On May 23, 2001, this Court granted the government's motion to take judicial notice of certain discovery responses made by UDF during the district court proceedings, namely, that UDF admitted that no part of its $259,980 of environmental cleanup costs was allowable as a bad debt deduction in 1993.

### Facts

UDF is an Ohio corporation with its principal place of business in Cincinnati. UDF manufactures and distributes milk and ice cream products to its own convenience stores, and also sells its products to over 1,000 wholesale accounts in a six-state region. At issue in this case are three categories of expenses incurred by UDF: soil remediation, corporate reorganization, and engineering studies.

### A. Soil Remediation

In 1989, UDF purchased two stores, numbered 649 and 140, located respectively on properties in Columbus and Cincinnati, Ohio, that contained underground gasoline storage tanks left by prior occupants. On both properties, the tanks had leaked, causing soil contamination. UDF purchased the store 649 property for $315,000, and the store 140 property for $450,000.[1] The properties for store 649 and store 140

---

[1] The district court made the factual finding that UDF purchased store number 649 in 1985. However, this finding is not supported by the record, which contains the purchase contract for the store 649 property, dated June 13, 1989, as well as the $315,000 counteroffer by the seller, dated June 20, 1989, and UDF's acceptance of the counteroffer, dated

were each worth less in a contaminated state than the prices paid for them by UDF.  Although UDF may not have been aware of the underground tanks prior to the closing date for two purchases, UDF was aware, by that time, of soil contamination on both properties.[2]

In 1990, UDF spent $136,864 on soil remediation for the store 649 property.  In 1991, UDF spent $123,698 on soil remediation for the store 140 property.  In 1993, UDF took a $259,980 deduction under § 162 for the cleanup costs.  On audit, the IRS determined that these costs could not be deducted, which the district court affirmed.

---

June 27, 1989.  (J.A. at 285.)

[2]The closing date for the purchase of store 649 was February 28, 1990.  A report prepared for UDF, dated December 18, 1989, indicated "significant levels of petroleum hydrocarbons . . . in the subsurface soils" of the Columbus property, and provided a "rough estimate" of $55,000 for soil cleanup.  (J.A. at 288, 291.)  An addendum to the purchase contract for store 649 provided that the purchase was contingent on the buyer's "obtaining satisfactory soil/tank tests within ninety (90) days of acceptance hereof."  (J.A. at 282.)  Notwithstanding the discovery, UDF completed the purchase.

The closing date for the purchase of store 140 was October 31, 1990.  An environmental assessment report prepared for UDF, dated May 31, 1989, concluded that "[a]lthough a gas station was operated at this site for approximately 4-5 years (1950-1955) there is no evidence of any spillage or of gas in the soil."  (J.A. at 296.)  The report also noted that two 5,500 gallon underground gas tanks were once stored on the property, but that the tanks had "presumably" been removed.  (J.A. at 295.)  Based on this report, on April 4, 1990, UDF waived the environmental contingency clause in the purchase contract.  A second environmental report on the property, prepared in September of 1990, found that soil had been contaminated from an underground storage tank system release.  The report estimated cleanup costs to be approximately $35,000 to $40,000.  Notwithstanding the discovery, UDF completed the purchase.

---

plan that is implemented, is not an abandonment loss under § 165(a).  *Nicolazzi v. Comm'r of Internal Revenue*, 79 T.C. 109, 130 (1982), *aff'd*, 722 F.2d 324 (6th Cir. 1983).

The district court divided its abandonment loss analysis of UDF's engineering studies into two categories:  first, the deductibility of payments to Hixson, Inc., and second, the deductibility of all other payments in connection with the studies.  As to the non-Hixson payments, the court found that the decision to construct the Erlanger Facility was not an "identifiable event" for § 165 purposes.  As to the Hixson payments, the court found that the payments were part of an integrated plan to construct the Erlanger facility, and thus did not constitute an abandonment loss under § 165.

### 1. Non-Hixson Payments/Identifiable Event

The district court found that UDF's decision to construct the Erlanger facility was not the "identifiable event" that rendered worthless the other studies related to UDF's older, Norwood plant.  UDF contends that the district court erroneously applied an objective standard of worthlessness to UDF's § 165 claim.  UDF argues that under *A.J. Indus.*, an objective standard of worthlessness applies only in the case of bad debts and worthless securities, and not to a loss of a capitalized asset.  Thus, UDF contends, a subjective standard under *A.J. Industries* applies to its purported abandonment of the engineering studies.  Under this subjective standard, "a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer."  *A.J. Indus.*, 503 F.2d at 670 (citation omitted).  UDF contends that the district court made such an unjustified substitution of business judgment regarding UDF's abandonment of various engineering studies.

However, the district court decision as to the non-Hixson payments did not turn on an objective standard of worthlessness; rather, the decision turned on UDF's failure to show an identifiable event that irrevocably cut ties to the

its simplification of corporate structure did not produce a significant benefit beyond the year in question. Accordingly, the district court did not err when finding that UDF's accounting fees must be capitalized under *INDOPCO*.

### C. Engineering Studies

UDF contends that the district court erred when finding that UDF did not abandon various engineering studies in 1993 and thus could not take abandonment losses under 26 U.S.C. § 165(a) in connection with those studies. A district court's determination of a taxpayer's intent to abandon property is reviewed under a clearly erroneous standard. *See Philhall Corp. v. United States*, 546 F.2d 210, 214 (6th Cir. 1976). The standard for determining "worthlessness" under § 165(a) analysis is a question of law to be reviewed *de novo*. *See Woolridge*, 875 F.2d at 545.

"There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). To take an abandonment loss under § 165(a), "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and . . . sustained during the taxable year." 26 C.F.R. §§ 1.165-1(b) and (d). Section 165(a) losses "have been referred to as abandonment losses to reflect that some act is required which evidences an intent to discard or discontinue use permanently." *Gulf Oil Corp. v. Comm'r of Internal Revenue*, 914 F.2d 396, 402 (3d Cir. 1990) (citing *A. J. Indus., Inc. v. United States*, 503 F.2d 660 (9th Cir.1974)). "'[I]n order for a loss of an intangible asset to be sustained and to be deductible, there must be (1) an intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment.'" *Gulf Oil*, 914 F.2d at 402 (quoting *A.J. Indus.*, 503 F.2d at 670). The "identifiable event" must be observable to outsiders and constitute "some step which irrevocably cuts ties to the asset." *Corra Res., Ltd. v. Comm'r of Internal Revenue*, 945 F.2d 224, 226-27 (7th Cir. 1991). An otherwise abandoned expenditure, if part of an integrated

### B. Corporate Reorganization

In 1992, UDF consisted of the parent company, United Dairy Farmers, Inc., and ten subsidiaries. The Lindner family owned UDF. Robert Lindner, Sr., owned approximately sixty percent of the company, and his four sons owned, directly or indirectly, the remaining forty percent. UDF was a C corporation, the earnings of which are subject to corporate income tax. A corporation that has elected S corporation status is not subject to an income tax, but rather is considered, for tax purposes, to be a pass-through entity.

In 1992, UDF decided to change its corporate form from a C corporation to an S corporation. During this time, UDF made additional changes to its organizational structure. In June of 1992, Robert Lindner, Sr., sold 38% of the outstanding shares in UDF to his four sons and to trusts set up for his grandchildren. In October of 1992, UDF created a new S corporation, called Uncle Bud's Fried Dough, Inc.

On December 31, 1992, UDF and its ten subsidiaries were merged into Uncle Bud's, which then changed its name to United Dairy Farmers, Inc. The post-merger UDF had the same stock ownership, officers and directors as the pre-merger UDF. The pre-merger UDF, along with its ten subsidiaries, ceased to exist as part of the merger.

In a sworn statement describing the merger, a UDF official provided that "[t]he purpose of the merger was to simplify the corporate structure of United Dairy Farmers, Inc., and affiliated companies. The merger was also consummated in order to permit the making of an S election under Section 1362(a)." (J.A. at 330.)

In January of 1993, Robert Lindner, Sr. sold his remaining interest in UDF to his sons. At the conclusion of the June and January sales, each of the four sons controlled 25% of the outstanding shares of UDF, either directly or as trustees.

The Code imposes a last-in-first-out ("LIFO") recapture tax on C corporations that make an S corporation election. I.R.C. § 1363(d). When a C corporation makes an S corporation election, the C corporation files a final tax return. The LIFO recapture tax seeks to ensure that a C corporation does not underestimate the actual value of its inventory when filing its final return, by calculating the difference between the value of a C corporation's inventory under a last-in-first-out method and a first-in-first-out method.

The accounting firm of Ernst & Young advised UDF that it was subject to a significant LIFO recapture tax if it made an S corporation election, which could be avoided by way of a merger. To avoid the tax, UDF created a shell corporation, Uncle Bud's Fried Dough, Inc., which had no operations or inventory. UDF and its subsidiaries then merged into Uncle Bud's, emerging as a single S corporation and changing its name to United Dairy Farmers, Inc. UDF believed that it had avoided triggering the recapture tax because Uncle Bud's, rather than the pre-merger UDF, made the S corporation election.

On its 1993 tax return, UDF claimed that payments made to Ernst & Young in 1992 and 1993 totaling $46,300 were deductible as ordinary and necessary business expenses. On audit, the IRS found that the payments were part of a corporate reorganization and must be capitalized, which the district court affirmed.

### C. Engineering Studies

### 1. Erlanger, Kentucky Distribution Site Studies

UDF's main office is in Norwood, Ohio. In the early 1990s, UDF began looking for a site on which to build a distribution facility that would house its own cold storage warehouses. Between 1991 and 1993, UDF paid Hixson, Inc., an engineering and design firm, to assist in locating an appropriate site. Hixson examined several potential sites. UDF intended to build only one distribution facility. Of the

in demonstrating that the reorganization had no effect on the Ernst & Young fees.

UDF offers little evidence in support of the claim that with or without a reorganization, the Ernst & Young fees would have remained unchanged. We find this lack of evidence particularly suspect, given that the very idea of a reorganization originated from Ernst & Young. Specifically, Lindner testified that the merger "was upon the advice of Ernst & Young and other accountants, advising us based upon tax ramifications as well as other issues, that companies similar to ours, it was advisable to seek S election." (J.A. at 406.) UDF now speaks of a clear divide between the S election and the reorganization. However, UDF identifies no record evidence in support of such a divide. As noted above, UDF stated that "[t]he purpose of the merger was to simplify the corporate structure of United Dairy Farmers, Inc., and affiliated companies. The merger was also consummated in order to permit the making of an S election under Section 1362(a)." (J.A. at 330.) Our review of the record does not indicate a clear divide between the S election and the reorganization, or between the amount of Ernst & Young fees and the reorganization. UDF fails to identify record evidence to the contrary.

Moreover, UDF has not even addressed the significant legal issue of how and why the "indirectly related" rule of *Wells Fargo* should be extended to include unsalaried, independent advisers, when the court in *Wells Fargo* expressly noted that its finding was based on the employer/employee relationship in that case. *Wells Fargo*, 224 F.3d at 887. However, we need not reach that issue, because UDF has not provided evidence supporting the more basic issue of whether the fees were "indirectly related" to the reorganization on grounds that there was no relationship between the reorganization and the amount of Ernst & Young's fees. Further, even assuming UDF's reading of *INDOPCO*, that reorganization expenses which do not produce a significant benefit beyond the year in question are deductible, UDF has provided no evidence that

to the "final decision" to reorganize, it is UDF's burden to provide such analysis, which UDF has not done.

Second, as to the "indirectly related" work itself, even if this Court were to adopt the Eighth Circuit's reading of *INDOPCO*, the relationship between the employer and its salaried employees in *Wells Fargo* is distinguishable from the relationship between UDF and Ernst & Young in this case.

The indirectly related costs at issue in *Wells Fargo* were salary expenses paid to employees who had worked on a corporate acquisition. The Eighth Circuit found that "payments made by an employer are deductible when they are made to employees, are compensatory in nature, and are directly related to the employment relationship (and only indirectly related to the capital transaction, which provides the long term benefit)." *Wells Fargo*, 224 F.3d at 887. *Wells Fargo* applied the "origin of the claim" doctrine when determining whether an expense was deductible or capital in nature; because the payments originated from the employment relationship, rather than from the capital transaction, the payments were deductible.[7] *Id*. The court then noted, when distinguishing the case from *Acer Realty Co. v. Commissioner of Internal Revenue*, 132 F.2d 512, 513 (8th Cir. 1942), that there "was no increase in [the employees] salaries attributable to the acquisition, and [the employees] would have been paid the salaries whether or not the acquisition took place." *Wells Fargo*, 224 F.3d at 888.

The first obstacle for UDF is that Ernst & Young employees are not salaried employees of UDF. That issue aside, the question becomes whether UDF has met its burden

---

[7]The court characterized "origin of the claim" analysis for determining the deductible or capital nature of an expense as looking to "the transaction or activity from which the taxable event proximately resulted." *Wells Fargo & Co. v. Comm'r of Internal Revenue*, 224 F.3d 874, 887 (8th Cir. 2000) (quoting *United States v. Gilmore*, 372 U.S. 39, 47 (1963)).

$55,000 spent by UDF to examine competing sites, only $16,500 related to the Erlanger, Kentucky site that was ultimately chosen.

On its 1993 tax return, UDF claimed that it could deduct those studies that related to all of the properties other than the Erlanger site, which had been abandoned upon deciding to go ahead with the Erlanger site. The government contended that UDF had engaged in one single project, which was to study available sites and build one distribution facility. Because the Hixson fees were incurred pursuant to one single plan, the government contended that all of the fees must be capitalized. The district court agreed with the government, finding that the fees were part of an integrated plan to build one distribution center and must be capitalized.

### 2. Norwood, Ohio Manufacturing Plant Studies

In the 1980's, the ice cream room at UDF's Norwood facility was operating at capacity. From late 1986 to late 1987, Hixson created plans to develop vacant space adjacent to the ice cream room so that production of a microwavable milk shake product, which had become popular, could be expanded. For a variety of reasons, UDF decided not to expand the ice cream room. Instead, in 1988, UDF converted the vacant space into a computer room, and never implemented the development plans. UDF paid Hixson $37,327 for its work in 1986 and 1987 on developing the vacant space.

In 1986, UDF retained Sieberling to design a "clean-in-place" ("CIP") system that would help separate the "raw" and "pasteurized" compartments of a milk manufacturing facility. The CIP system is an automated process for cleaning the lines in UDF's plant. At the same time, Sieberling also looked at automating a portion of the ice cream manufacturing process. UDF paid Sieberling $31,906 for its work between 1986 and 1988. After 1993, UDF commissioned a new study from a

different consultant to automate the portion of the ice cream manufacturing process that Sieberling had been researching.

In 1990, UDF commissioned a study from Bonar Engineering to increase the freezing capacity at the Norwood plant, for which it paid $4,300. The project was not implemented.

UDF also commissioned, for $22,000, an advanced handling systems study in 1992, relating to "movement" of UDF products from the factory to retail stores. UDF could still implement the study in Norwood, but has not done so because its current method of moving products is less expensive.

UDF deducted each of the Norwood studies in 1993 on the theory that it had abandoned the projects in that year and that a loss deduction could be taken under § 165 of the Code. Although several of the expenditures were made several years prior to 1993, UDF argued that the event that caused the abandonment, the opening of the Erlanger distribution center, occurred in 1993. The government responded that UDF had failed to prove that any of the projects were abandoned in 1993. The district court agreed that no losses in connection with these projects could be taken in 1993. The court found that the projects relating to the Norwood plant were unrelated to the decision to build a distribution center in Erlanger, and thus the Erlanger decision did not cause the abandonment of the Norwood-related projects.

## DISCUSSION

Whether a business expense is capital in nature is a factual determination that this Court reviews under a clearly erroneous standard. *Walters v. Comm'r of Internal Revenue*, 383 F.2d 922, 924 (6th Cir. 1967). A finding is clearly erroneous only when the reviewing court, in light of the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Kennedy v. Comm'r of Internal Revenue*, 671 F.2d 167, 174 (6th Cir.1982). This Court

obtained an additional, one-time tax benefit, being the avoidance of the LIFO recapture tax.

The district court found that under *INDOPCO*, the accounting fees related to a corporate reorganization, and thus must be capitalized. UDF attempts to distinguish *INDOPCO* by arguing that *INDOPCO* applies only to reorganization expenses that produce "significant benefits . . . beyond the year in question," *INDOPCO*, 503 U.S. at 87, rather than reorganization expenses that merely produce a one-time benefit. Moreover, UDF argues that under *Wells Fargo & Co. v. Commissioner of Internal Revenue*, 224 F.3d 874 (8th Cir. 2000), *INDOPCO* only addressed costs that were directly related to the transaction which produced a long term benefit, and that costs only indirectly related to such a transaction need not be capitalized. *Wells Fargo*, 224 F.3d at 886. UDF contends that because its accounting fees were only indirectly related to its corporate reorganization, under *Wells Fargo* those fees are deductible. Alternatively, UDF contends that because the accounting fees were only attributable to the "investigatory stage" of its corporate reorganization, the fees were deductible investigatory costs. *Id*. at 888-89.

First, UDF's "investigatory stage" argument is unavailing. The Eighth Circuit in *Wells Fargo* agreed with the IRS position that any investigatory expenses which post-date the "final decision" to engage in a capital transaction must be capitalized. *Id*. at 889. A "final decision" on a capital transaction is made when the question of whether to go ahead with the transaction is made.[6] *Id*. The UDF merger occurred on December 31, 1992. UDF offers no analysis of when the "final decision" for that merger occurred. Nearly all of the Ernst & Young invoices for the fees at issue were dated in 1993. Even if these invoices reflected services rendered prior

---

[6] In an acquisition context, a "final decision" also requires a decision on which business to acquire. *Id.*

as to how that debt became worthless in 1993.  A taxpayer may deduct "any debt which becomes worthless within the taxable year."  I.R.C. § 166(a)(1).  To establish a bad debt reduction in 1993, UDF must show that (1) a legally enforceable debt was owed to it by a third party; and (2) during 1993 that debt become worthless, i.e., uncollectible. *Roth Steel Tube Co. v. Commissioner of Internal Revenue*, 620 F.2d 1176, 1180 (6th Cir. 1980).  "[A] taxpayer may not of its own act render a collectible debt uncollectible, charge off the debt as worthless, and then deduct it from income for purposes of taxation."  *Id*. at 1181.

UDF's only argument regarding how a debt owed to it became worthless in 1993, made in its reply brief, references the testimony of Robert D. Lindner, Jr., who claimed that UDF could not determine, or could not afford the cost of determining, which of the pre-contamination owners had actually caused the soil damage. Lindner testified that counsel advised UDF that without engaging in "costly" investigation, the "opportunity to successfully win the case [against the pre-contamination owners] would be 'difficult.'" (J.A. at 399-400.)  This testimony does not establish that the debt at issue, assuming UDF is owed a debt, because worthless in 1993. The requisite evidentiary showing for "worthlessness" is that a legal action to enforce payment "would in all probability not result in the satisfaction of execution on a judgment". 26 C.F.R. § 1.166-2.  The above testimony only describes the prospects for obtaining a judgment as "difficult," and that assessment is given only in the context of an investigation that would not be "costly."  UDF offers no assessment, outside of that limited context, of the prospects for obtaining a judgment.  We find UDF's bad debt claim waived, conceded, and meritless.

## B.  Corporate Restructuring

UDF argues that its accounting expenses should have been deducted, rather than capitalized, because the expenses only related to the making of an S election, achieved by means that

reviews a district court's conclusions of law *de novo*.  *See Woolridge v. Marlene Indus. Corp.*, 875 F.2d 540, 545 (6th Cir. 1989).

At the trial court level, UDF had the burden of proving, by a preponderance of the evidence, (1) that the IRS assessments were arbitrary and erroneous; and (2) the amount of deduction to which it was entitled.  *United States v. Janis*, 428 U.S. 433, 440-41 (1976).  "[A]n income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer." *INDOPCO, Inc. v. Comm'r of Internal Revenue*, 503 U.S. 79, 84 (1992) (internal quotation marks and citations omitted).

Section 162(a) of the Code allows deduction of all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."  *See* I.R.C. § 162(a).  However, an expense cannot be deducted if it is capital in nature, meaning an expense "paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."  I.R.C. § 263(a)(1).  "If an expense were to fall under the language of section 263(a), that section would 'trump' the deductibility provision of section 162(a) and the expense would have to be capitalized. Thus, in order to be deductible, the expense must both be 'ordinary and necessary' within the meaning of section 162(a) and fall outside the group of capital expenditures envisioned by section 263(a)." *PNC Bancorp, Inc. v. Comm'r of Internal Revenue*, 212 F.3d 822, 827 (3d Cir. 2000) (emphasis omitted).  Because the Code describes what should be capitalized generally, but enumerates allowable deductions specifically, "deductions are strictly construed and allowed only as there is a clear provision therefor."  *INDOPCO*, 503 U.S. at 84  (internal quotation marks and citations omitted).

### A.  Soil Remediation

UDF contends that its soil remediation costs were deductible as ordinary and necessary business expenses under § 162.  The government responds that the expenditures resulted in  permanent improvements to UDF's property and thus must be capitalized under § 263.

The Fourth Circuit has recently addressed the issue of deductibility of environmental cleanup costs under § 162.  In *Dominion Resources, Inc. v. United States*, 219 F.3d 359, 370-71 (4th Cir. 2000), the court considered whether environmental cleanup costs were mere repairs, and thus deductible under § 162, or permanent improvements, which must be capitalized under § 263.  The court's analysis relied on the "put versus keep" test articulated in *Estate of Walling v. Comm'r of Internal Revenue*, 373 F.2d 190, 192-93 (3d. Cir. 1967),[3] and focused on the nature of the improvement, rather than on the value added by the improvement.  Under *Dominion Resources*, costs that merely restore value to property "that existed prior to deterioration or to a discrete event that damaged the property" are deductible as repairs under § 162, while costs that allow the property to be used "in a different way" must be capitalized under § 263.  *Dominion Res.*, 219 F.3d at 371.

The key issue in this case, for purposes of determining whether UDF's environmental cleanup costs allowed the property to be used "in a different way" and thus must be capitalized under § 263, is whether UDF's property conditions are to be evaluated, as UDF contends, as of the time prior to contamination of the soil.  The government responds that the property should be evaluated as of the time

---

[3]Under the "put versus keep" test, improvements that "put" an asset in efficient operating condition are capital in nature, while improvements that "keep" an asset in efficient operating condition are deductible. *Dominion Res., Inc. v. United States*, 219 F.3d 359, 371 (4th Cir. 2000).

For the above reasons, we find that the district court's decision not to extend *Plainfield-Union* and Revenue Ruling 94-38 to cover a taxpayer seeking a deduction for environmental cleanup costs as "repairs" under § 162, when that taxpayer did not contaminate the property in the ordinary course of its business, was not in error.

As noted by the government in its brief on appeal, when taken together, *Dominion Resources*, *Plainfield-Union*, and Revenue Ruling 94-38 can be harmonized in a coherent framework.  That is, three elements must be satisfied for a valid deduction under § 162 for environmental cleanup costs: first, the taxpayer contaminated the property in its ordinary course of business; second, the taxpayer cleaned up the contamination to restore the property to its pre-contamination state; third, the cleanup did not allow the taxpayer to put the property to a new use.  In *Dominion Resources*, the taxpayer did not satisfy the third element, because the cleanup allowed the taxpayer to put the property to new use as a real estate development.  *Dominion Res.*, 219 F.3d at 370.  In this case, failure to satisfy the first element is sufficient for rejecting UDF's soil remediation claim.

UDF argues alternatively that it was entitled to deduct the remediation expenses as bad debt expenses, because the prior owners had a legal obligation to reimburse UDF for the expenses.  UDF did not raise this argument below.  "The fact that the issue newly raised on appeal requires or necessitates a determination of facts is generally deemed good reason to refuse consideration of the issue for the first time in the appellate court."  *Taft Broad. Co. v. United States*, 929 F.2d 240, 244 (6th Cir. 1991).  Moreover, this Court has taken judicial notice of UDF's concession of the bad debt issue during discovery.

UDF's waiver and concession of the issue aside, the bad debt argument would be unavailing for UDF even on the merits, simply because UDF has offered almost no argument, even assuming that UDF is owed a legally enforceable debt,

nature turns on the special facts of each case, *INDOPCO,* 503 U.S. at 86, we are hesitant to fashion a blanket rule as to the particular time at which property must be evaluated for determining whether that property has been put to a "new" use. However, we are able to derive one clear principle from *Dominion Resources* and the *Jones* cases:  when a taxpayer improves property defects that were present when the taxpayer acquired the property, the remediation of those defects are capital in nature.   Thus, under *Dominion Resources* and the *Jones* cases, when a taxpayer has improved defects that were present when the taxpayer acquired the property, *Plainfield-Union* does not apply.

Because UDF has relied exclusively on the restoration cases, UDF offers no comparison of its use of the two Ohio properties before and after the soil remediation.[5]  Thus, UDF offers no argument that its use of the property was unchanged before and after the improvements.  Accordingly, UDF has not met its burden of clearly showing its right to the claimed deduction. *INDOPCO,* 503 U.S. at 84.

Moreover, as noted in *Dominion Resources,* large environmental cleanup costs, relative to property value, cast doubt on a taxpayer's claim of merely making "incidental" repairs that only keep the property in "an ordinarily efficient operating condition."   *Dominion Res.,* 219 F.3d at 372 (quoting 26 C.F.R. § 1.162-4).  In this case, UDF claimed cleanup costs of nearly $260,000 for two properties that it purchased for, collectively, $765,000.  In contrast, the public utility in *Plainfield-Union* deducted costs to clean and line less than one percent of its water mains, which the court characterized as a "very minor" part of the taxpayer's operation. *Plainfield Union,* 39 T.C. at 335-336, 339.

---

[5]UDF's only comparative analysis of property value or use is its contention that the post-remediation soil was in no better condition than the pre-contamination soil.  However, this argument again assumes applicability of the *Plainfield-Union* standard, which we have determined does not apply in this case.

UDF acquired it, that is, after contamination, but before remediation, of the soil.

UDF contends that under *Plainfield-Union Water Co. v. Comm'r of Internal Revenue,* 39 T.C. 333 (1962), and Revenue Ruling 94-38, property conditions should be evaluated as of the time "prior to the condition necessitating the expenditure." *Plainfield-Union,* 39 T.C. at 338. Revenue Ruling 94-38, citing *Plainfield-Union,* found that post-improvement property value should be measured against the property as of the time prior to the condition necessitating the expenditure.   Whether the *Plainfield-Union* standard for measuring property value should apply to this case is a question of law to be reviewed *de novo.  See Woolridge,* 875 F.2d at 545.

The district court addressed Revenue Ruling 94-38, but not *Plainfield-Union,* because UDF failed to include *Plainfield-Union* in its argument below.[4]   The district court distinguished Revenue Ruling 94-38 as a "restoration" case, in which the taxpayer acquires property in a clean condition, contaminates the property in the course of its ordinary business operations, and then incurs costs in restoring that property to its originally clean condition.  Thus, the district court reasoned, because UDF bought contaminated, rather than clean, property, UDF could not rely on Revenue Ruling 94-38.  As in Revenue Ruling 94-38, the impaired property condition in *Plainfield-Union,* specifically the reduced carrying capacity of a water main caused by the flow of acidic water, arose during the ordinary course of the taxpayer's business. *Plainfield-Union,* 39 T.C. at 335.

Basically, UDF invites this Court to extend *Plainfield-Union* and Revenue Ruling 94-38 to a situation where a

---

[4]We will not consider Plaintiff's *Plainfield-Union* argument waived for two reasons.  First, because Revenue Ruling 94-38 expressly relied on *Plainfield-Union;* and second, because *Plainfield Union* allows for more complete discussion of the issue raised by Revenue Ruling 94-38.

taxpayer, rather than experiencing contamination or impairment of its property in the ordinary course of the taxpayer's business, purchases property in an already contaminated or impaired state. We find, for several reasons, that the district court did not err when declining to extend *Plainfield-Union* and Revenue Ruling 94-38 to this case.

First, to extend *Plainfield-Union* and Revenue Ruling 94-38 to these facts would be inconsistent with the persuasive reasoning of *Dominion Resources* and the two cases on which its "new use" test primarily relied. *See Jones v. Comm'r of Internal Revenue*, 242 F.2d 616 (5th Cir. 1957); *Jones v. United States*, 279 F. Supp. 772 (D. Del. 1968).

*Dominion Resources* relied on the two *Jones* cases for the position that improvements which allowed a property to once again be income-producing, or allowed property to be put on the market for sale, "enabled the taxpayer to do something new with the property," and thus must be capitalized under § 263. *Dominion Res.*, 219 F.3d at 372 (citing *Jones*, 242 F.2d at 617-18; *Jones*, 279 F. Supp. at 776).

In *Jones v. Commissioner*, the property at issue had been deemed unfit for habitation, and thus unprofitable, prior to the taxpayer's acquisition of the property. *Jones*, 242 F.2d 617. "The taxpayer then undertook to put the building into such condition as would permit it again to be used and be productive of income." *Id*. at 617-18. By describing the property as *again* being usable and profitable, the court implied that the property had, at some prior time, been usable and profitable. Significantly, however, the Fifth Circuit in *Jones* did not evaluate the property as of the time of its earlier useful and profitable condition; rather, the court evaluated the property as of the time the taxpayer acquired it, when the property was unfit for habitation.

Similarly, the district court in *Jones v. United States* considered property which had been inherited by the taxpayer in 1940, subject to the life interest of the taxpayer's father,

who died in 1955. *Jones*, 279 F. Supp. at 773. The property had fallen into a state of disrepair between 1940 and 1955. *Id*. After the father's death, the taxpayer incurred significant expenses to improve the property.

Under UDF's theory, the district court in *Jones* should have evaluated property value or use from the time prior to the period of disrepair. However, the court in *Jones*, when finding that the improvements were essential to "put" the property in rentable condition, rather than merely "keep" the property in such condition, considered property condition as of the time prior to the improvements, not as of the time prior to the event giving rise to the improvements, namely, the prolonged period of disrepair. *See id.* at 776. Simply, the state of the improved property "prior to the condition necessitating the expenditure," *Plainfield-Union*, 39 T.C. at 338, was not considered in either of the *Jones* decisions.

In addition, the court in *Dominion Resources* noted that the environmental cleanup in that case "lifted the property out of what was essentially a condition of uselessness." *Dominion Res.*, 219 F.3d at 372. The property at issue, however, had not always been useless; it had previously been used as a power plant. *Id*. at 361. Further, the court in *Dominion Resources* noted that part of the taxpayer's environmental cleanup was of contamination that had been present since the original construction of the asset. *Dominion Res.*, 219 F.3d at 372 ("[A]t least some of the asbestos containing materials removed from the power plant were used in the original construction of the power plant on the property.").

We find one core distinction between, on the one hand, the "restoration cases" of *Plainfield-Union* and Revenue Ruling 94-38, and on the other, *Dominion Resources* and the *Jones* cases. In the restoration cases, there was no relationship between the improvements and any defect that existed at the time the taxpayer acquired the property. In *Dominion Resources* and the *Jones* cases, there was such a relationship. Because the question of whether an expense is capital in