**FEDEX CORPORATION, Federal Express Corporation, and Subsidiaries, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 01–2200 MA/A.**

United States District Court,
W.D. Tennessee,
Western Division.

Aug. 27, 2003.

---

Colby S. Morgan, Jr., FedEx Corporation, Legal Department, Memphis, TN, Joseph L. Schiffhouer, Kathleen L. Chambers, Federal Express Corporation, Tax & Benefit Law, Memphis, TN, Kenneth W. Gideon, Albert H. Turkus, Skadden Arps Slate Meagher & Flom LLP, Washington, DC, for FedEx Corp., Federal Express Corp.

James J. Wilkinson, Lawrence P. Blaskopf, Richard G. Jacobus, U.S. Department of Justice, Tax Division, Washington, DC, for U.S.

James Allen, Memphis, TN, pro se.

## MEMORANDUM OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

MAYS, District Judge.

The court held a bench trial in Phase I of this case, beginning on April 21, 2003, and concluding on May 28, 2003. As required by Rule 52 of the Federal Rules of Civil Procedure, the court now sets forth its findings of fact and conclusions of law. Plaintiffs are FedEx Corporation, Federal Express Corporation, and their subsidiaries. Collectively, the court will refer to Plaintiffs as "FedEx." Defendant is the United States of America.

This is a tax refund suit. It arises from a dispute about the tax treatment of Fe-dEx's off-wing engine maintenance program during the 1993 and 1994 tax years. The Internal Revenue Service ("IRS") contends that FedEx's expenses related to that maintenance program are non-deductible capital expenditures under 26 U.S.C. § 263(a). FedEx argues that they are ordinary and necessary business expenses deductible under 26 U.S.C. § 162.

This court has original jurisdiction under 28 U.S.C. § 1346(a)(1).

### I. Subsidiary Findings of Fact

On February 15, 1994, FedEx timely filed Form 1120, United States Corporate Income Tax Return ("the 1993 Return"), for the taxable year that ended on May 31, 1993 ("TY 1993"). (JPTO ¶ 3.)[1] On February 15, 1995, FedEx timely filed Form 1120, United States Corporate Income Tax Return ("the 1994 Return") for the taxable year that ended on May 31, 1994 ("TY 1994"). (JPTO ¶ 4.) FedEx timely paid the full income tax shown according to the 1993 Return and the 1994 Return. (JPTO ¶¶ 4–5.)

Upon review of the 1993 Return and the 1994 Return, the IRS, acting through its office in Memphis, Tennessee, issued reports proposing adjustments to the returns. (JPTO ¶ 7.) Among the adjustments proposed were capitalization of engine shop visits ("ESVs")[2] and of airframe heavy maintenance activity. (JPTO ¶ 7.) These reports are referred to as the "30–Day Letters." (JPTO ¶ 7.) After FedEx protested certain adjustments proposed in the 30–Day Letters, FedEx and the IRS resolved most of the items at issue.

---

1. The court will cite the Joint Pretrial Order Uncontested Facts as "JPTO".

2. "ESV" stands for engine shop visit. ESVs refer to periodic "off-wing" maintenance performed on engines and APUs by specialized vendors known as engine shops. Except where the court explicitly states otherwise, the court's reference to ESVs refers only to the ESVs at issue in this case—those whose cost FedEx seeks to deduct as business expenses.

(JPTO ¶ 8.) FedEx and the IRS, however, did not resolve their dispute as to the proper Federal income tax treatment of ESVs during TY 1993 and TY 1994. (JPTO ¶ 8.) In the 30–Day Letters, the IRS asserted that, if ESVs were given the proper tax treatment, FedEx would owe a combined additional $37,428,624 in taxes for TY 1993 and TY 1994. (JPTO ¶ 10.)

On August 11, 2000, FedEx paid the IRS $70,000,000, the disputed amount plus interest, but maintained that FedEx's legal interpretation was correct and requested a refund. On January 4, 2001, the IRS informed FedEx of the IRS's intent to deny the refund request. On March 15, 2001, FedEx filed the instant action.

### A. Treatment of Aircraft, Engines, and Auxiliary Power Units by FedEx and the Airline Industry

As part of its business, FedEx operated and continues to operate a fleet of aircraft. (JPTO ¶ 17.) During TY 1993 and TY 1994 FedEx operated 205 and 202 aircraft, respectively. (JPTO ¶ 17.) FedEx's aircraft included Boeing 727s ("727"), McDonnell Douglas DC–10s ("DC–10"), and McDonnell Douglas MD–11s ("MD–11"). (JPTO ¶ 17.) Propulsion power for each FedEx 727, DC–10, and MD–11 was provided by three installed jet aircraft engines. (JPTO ¶ 19.) During TY 1993 and TY 1994, Pratt & Whitney series JT8D engines were used to power FedEx 727s; General Electric ("GE") CF6–6D model engines were used to power FedEx DC–10–10s; GE CF6–50C2 model engines were used to power FedEx DC–10–30s; and GE CF6–80C2D1F model engines were used to power FedEx MD–11s. (JPTO ¶¶ 19–20.) During TY 1993 and TY 1994, auxiliary power for FedEx 727s was provided by GTCP85 series auxiliary power units ("APUs") and auxiliary power for

FedEx DC–10s and MD–11s was provided by TSCP700 series APUs. (JPTO ¶¶ 22–23.)

Off-aircraft inspection, heavy maintenance, and repair of jet aircraft engines and APUs were conducted in almost all instances by third-party vendors during ESVs after removal of the engines or the APUs from the aircraft. (JPTO ¶ 19.) FedEx's aircraft could not operate without three engines installed at all times. (JPTO ¶ 66.) When FedEx removed one of the three engines from the wing to send it to an engine shop for an ESV, FedEx replaced the engine with another used FedEx engine that had returned from an ESV. (JPTO ¶ 66; Tr. Ex. 220 Moskal Dep. at 94–95.) Typically, only one of the three engines was removed at any given time, and an APU was not removed at the same time an engine was removed. (Tr. Clarke 4/23 at 560.)

Airframe heavy maintenance visits were generally scheduled based on flight hours or calendar time since the last heavy maintenance visit. (Tr. Cukor 4/24 at 846–47.)

Aircraft engine ESVs, when "planned", were sometimes based on engine use, measured in hours since last shop visit or cycles since last shop visit. (Tr. Cukor 4/24 at 847; Tr. Tisdale 4/21 at 162, 184–85.)[3] These intervals were called "soft-time" thresholds and were based on FedEx's internal policies. (Tr. Cukor 4/24 at 847; Tr. Tisdale 4/21 at 161–62, 184–85.) Sometimes "planned" ESVs were scheduled because an engine had reached a "hard-time" threshold, meaning that immediate service was needed to comply with an FAA requirement that a life-limited part be replaced or with an FAA airworthiness directive that mandated disassembly. (Tr. Cukor 4/24 at 847, 914–15; Tr. Tisdale 4/21 at 162, 184–85.) An unexpected condition,

---

**3.** A cycle is one take-off and one landing. (Tr. Tisdale 4/21 at 187–88.)

like foreign object damage, could precipitate an "unplanned" ESV. (Tr. Cukor 4/24 at 847–48.)

When an engine reached a "hard-time" threshold, that engine became "unserviceable." (Tr. Buller 4/21 at 131.) It had not become inoperable, but under FAA requirements, it was no longer "airworthy." It could not be re-mounted to an aircraft until the internal part that had reached its "hard-time" limit had been inspected and repaired if necessary, and an airworthiness certificate had been issued. (Tr. Buller 4/21 at 131.)

APU ESVs generally took place on an "on-condition" (as-needed) basis. (Tr. Tisdale 4/21 at 186.)

Airframe heavy maintenance visits could not be performed without the aircraft's being taken out of service. (JPTO ¶ 66.) Engine and APU ESVs occasionally coincided with airframe heavy maintenance visits, but the engines and APUs could be removed and replaced without taking the aircraft out of service for a substantial period of time. Therefore, coordination was unnecessary. (JPTO ¶ 66.) When FedEx's engines and APUs remained on-wing during airframe heavy maintenance visits, they were inspected, but did not usually undergo maintenance. (Tr. Tisdale 4/21 at 214; JPTO ¶ 66; Tr. Yerger 4/30 at 195.)

During TY 1993 and TY 1994, FedEx maintained separate written maintenance policies for engines and airframes. (Tr. Ex. 20 JT8D Build Standard Threshold Report; Tr. Ex. 216 JT8D Engine Maintenance Policy.) In developing policies for engines and airframes, FedEx was guided by the "Airline/Manufacturer Maintenance Program Development Document MSG–3, Revision 2" ("MSG–3") and earlier versions of the same document. (FX0133181–FX0133233 [4]; Tr. Buller 4/21 at 115–16.) MSG–3 was developed by the Industry Steering Committee, a body of industry experts who shared expertise and developed policies that they recommended to members of the aircraft industry like FedEx. (Tr. Buller 4/21 at 112–14.) MSG–3 established inspection and maintenance standards for both on-aircraft and off-aircraft maintenance activities for all components of an aircraft. (Tr. Buller 4/21 at 117–21.)

Heavy maintenance of FedEx airframes, engines, and APUs was planned and coordinated by the base maintenance group. (Tr. Cukor 4/24 at 848–51.) Within the base maintenance group, the propulsion maintenance group coordinated ESVs, and the airframe vendor maintenance group coordinated the heavy maintenance of airframes. (Tr. Cukor 4/24 at 850–51.)

Under 14 C.F.R. § 1.1 of the Federal Aviation Regulations ("FARs"), an "Airplane" was an "engine-driven fixed-wing aircraft heavier than air, that is supported in flight by the dynamic reaction of the air against its wings." (JPTO ¶ 49.) Airplanes operated by FedEx could not fly without mounted serviceable jet aircraft engines. (Tr. Clarke 4/23 at 582–82; Tr. Whitehouse 5/22 at 13–14.)

Virtually all jet aircraft engines and APUs operated by FedEx in TY 1993 and TY 1994 were acquired or leased by FedEx as installed components of completely assembled aircraft or as spares in connection with the acquisition of completely assembled aircraft. (Tr. Cukor 4/24 at 750–51.) In TY 1993 and TY 1994, FedEx acquired only a small number of jet aircraft engines or APUs in stand-alone purchases. (Tr. Cukor 4/24 at 750.) FedEx

---

4. Documents referred to by "FX" bates numbers come from 21 CD ROM disks entered into evidence as Exhibits 1–21, provided separately and installed as a group on a laptop computer by consent of the parties.

never purchased airframes separately; it purchased only airframes that were parts of completely assembled aircraft. (Tr. Cukor at 754–55.)

Stand-alone engine and APU transactions occurred during TY 1993 and TY 1994. (Tr. Brasie 4/29 at 195.) Such transactions, however, were ad hoc and were not significant sources of engines or APUs for major carriers like FedEx. (Tr. Brasie 4/29 at 196–97; Tr. Cukor 4/24 at 754–56.) Demand for stand-alone used engines was low because carriers acquired spare engines and APUs when they acquired aircraft to ensure that they had a consistent stock of compatible engines and APUs. (Cukor Tr. 4/24 at 754.)

During TY 1993 and TY 1994, none of the major airframe manufacturers also manufactured jet aircraft engines. (Tr. Cukor 4/24 at 852–53.) The major engine manufacturers aggressively marketed their engines to air carriers during this period, providing incentives directly to the carriers to persuade them to equip their fleets with the manufacturers' engines. (Tr. Cukor 4/22 at 830–31.) FedEx purchased new engines and APUs directly from the original manufacturers. (Tr. Cukor 4/22 832–833.)

FedEx timed its purchase of new engines and APUs to coincide with fleet purchases of new completely-assembled aircraft and required the engine manufacturer to install the engines on the airframes so that the airframe manufacturer could deliver the required completely-assembled aircraft to FedEx. (Tr. Cukor 4/22 at 753–54, 833.) When FedEx made a fleet purchase of used completely-assembled aircraft from another air carrier (often a passenger carrier), it also purchased spare engines and APUs because the selling air carrier would similarly have acquired spares at the time it acquired the aircraft. (Tr. Cukor 4/22 at 753–55.) When a given model aircraft is

retired, the engines that powered that model become obsolete. (Tr. Cukor 4/24 at 810.)

Jet aircraft engines and APUs can be appraised separately from completely-assembled aircraft. (Tr. Brasie 4/29 at 106–07.) The vast majority of such appraisals during TY 1993 and TY 1994, however, were performed in conjunction with "full appraisals"—the appraisals of completely-assembled aircraft—rather than isolated appraisals of aircraft components. (Tr. Cukor 4/24 at 760–61; Tr. Brasie 4/29 at 106–07.) FedEx did not perform stand-alone appraisals of jet aircraft engines or APUs. (Tr. Cukor at 760–61; Tr. Whitehouse 5/19 at 68–70.)

For financial accounting and tax purposes in TY 1993 and TY 1994, FedEx maintained separate accounts on its books for each type of airframe and engine in its fleet. (JPTO ¶¶ 92–92.) For purposes of FedEx's accounts, an airframe included all portions of the aircraft (including the installed APU) other than the engines. (JPTO ¶ 92; Tr. Kelley 4/28 at 7–8.) FedEx's allocations of used aircraft purchase prices between the engines and the remainder of the aircraft were made solely by members of FedEx's Accounting Department, none of whom was an expert in engine or aircraft valuation. (Tr. Kelley 4/28 at 19.) These allocations had no impact on FedEx's income for book or tax purposes and little time was spent making these allocations. (Tr. Kelley 4/28 at 19.)

The International Society of Transport Aircraft Trading ("ISTAT") defines the "economic useful life" of an aircraft or aircraft engine as "the period of time over which it is (or is expected to be) physically and economically feasible to operate it in its intended role. Periodic maintenance and repair will usually be required to preserve safety and efficiency during the economic useful life." (Tr. Ex. 134 at 22.)

ISTAT defines "maintenance" as "actions required for restoring or maintaining an item in serviceable condition, including . . . overhaul." An ESV is an "overhaul" under the ISTAT definition. (Tr. Whitehouse 5/21 at 258–59.)

The economic useful life of the airframes and aircraft operated by FedEx during TY 1993 and TY 1994 exceeded thirty (30) years. (JPTO ¶ 84; Tr. Whitehouse 5/22 at 13.) To attain this expected useful life, airframes had to undergo periodic maintenance and repairs, including heavy maintenance. (Tr. Whitehouse 5/22 at 13.) FedEx expected its jet aircraft engines and APUs to perform for the entire useful life of the aircraft they powered: in excess of thirty (30) years. (Tr. Cukor 4/24 at 809–10.; Tr. Brasie 4/29 at 221; Tr. Yerger 4/30 at 168–72.) To attain this expected useful life, FedEx's jet aircraft engines and APUs had to undergo periodic on-wing and off-wing maintenance, including ESVs. (Tr. Tisdale 4/22 at 364–70; Tr. Clarke 4/23 at 573–79.)

### B.   ESV Activities

During TY 1993 and TY 1994, the average interval between successive ESVs for an aircraft engine was approximately 24 to 36 months for FedEx's CF6 engines and 48 to 60 months for FedEx's JT8D engines. (JPTO ¶ 77.)

ESVs included some or all of the following activities: disassembly, cleaning, inspection, repair, replacement, reassembly, and testing. (JPTO ¶ 50.) ESVs are integrated processes: the later steps are dependent on the performance of the earlier steps. In the ESVs at issue in this case, the engine or APU was removed from the aircraft by FedEx and shipped to an outside vendor who performed the ESV. (JPTO ¶ 109.) After removing an engine or APU, FedEx assessed the condition of the engine or APU and reviewed the work performed during previous ESVs to determine the level of maintenance an engine or APU was likely to require. (Tr. Tisdale 4/21 at 199.) This assessment resulted in a preliminary plan of maintenance, called the "workscope," that FedEx provided to the vendor. (Tr. Tisdale 4/21 at 200.)

When the engine or APU arrived at the vendor, it was cleaned and externally inspected. (Tr. Mathieson 4/23 at 646.) Regardless of condition, it was thoroughly inspected visually and, as appropriate, further inspected using a number of nondestructive testing procedures. (JPTO ¶ 52.) The workscope was often modified at the engine shop when the initial cleaning and inspection revealed defects that had not been detected at FedEx. (Tr. Tisdale 4/21 at 201.)

The engine or APU was then disassembled into major parts or "modules."[5] (JPTO ¶ 52.) In some cases, the modules were further disassembled into piece parts. (JPTO ¶ 52.) If inspection or testing had disclosed a discrepancy in a part's conformity to the specifications set forth in FedEx's Engine Inspection and Maintenance Program, the part was repaired, or

---

**5.** The original equipment manufacturers designed engines and APUs to disassemble into modules to facilitate their maintenance. Each module was independently assessed by FedEx and prescribed a level of maintenance in the workscope. (Tr. Tisdale 4/21 at 173.) Modules for a given model engine were interchangeable so that a module would occasionally be removed from one engine and installed on a different engine. (JPTO ¶ 54.) The CF6 engine was comprised of five modules: the high pressure compressor, the combustor, the high pressure turbine, the low pressure turbine, and the gearbox. (Tr. Tisdale 4/21 at 173.) The JT8D engine was comprised of six modules: the low compressor, the high compressor, the diffuser and burn module, the HPT module, the LPT module, and the exhaust module. (Tr. Clarke 4/23 at 533; Tr. Ex. 88.) An APU was comprised of two modules: the power section and the gearbox. (Tr. Tisdale 4/21 at 173.)

if necessary, replaced with a new or used serviceable part conforming to the specifications. (JPTO ¶ 55; Tr. Tisdale 4/21 at 230–32.) Engine and APU parts were repaired if: (i) repair was feasible, (ii) repair was the lowest cost alternative to bring the part into conformity with specifications, and (iii) repair was permitted by FedEx's Powerplant Specification Manual. (JPTO ¶ 56.)

ESV repairs were performed either by the vendor or by one of the vendor's subcontractors. (Tr. Tisdale 4/21 at 234.) Minor repairs included cleaning and restoring the surface finish of engine blades. (Tr. Tisdale 4/21 at 234.) An example of a more extensive repair would be restoring the tip of a blade by welding additional metal to the end. (Tr. Tisdale 4/21 at 235.) After necessary repairs and replacements were completed, the engine or APU was reassembled, tested, and returned to FedEx with an FAA Form 337, titled "Major Repair or Alteration." (JPTO ¶ 62.)

## C. Part Replacement in ESVs

If a part could be repaired, but could not be repaired in time to be returned to the engine or APU with which the part had arrived, the vendor would first attempt to replace the part with a similar part from "customer stock." (Tr. Mathieson 4/23 at 663.) Typically, customer stock parts were used parts that had been replaced or exchanged and repaired at FedEx's cost during an earlier ESV, had been stored, and were now being returned to FedEx engines at no additional cost to FedEx. (Tr. Mathieson 4/23 at 662–64.) If a part were not available from customer stock, the part was "exchanged." (Tr. Mathieson 4/23 at 663.) The exchange was with a used, serviceable part in the vendor's inventory, so that the vendor could timely complete the ESV. (Tr. Clarke 4/23 at 623.) When a part was exchanged, the part was removed from the engine or APU, and FedEx was charged only for the cost of repairing the part plus an exchange fee. (Tr. Clarke 4/23 at 623.)

Replacements from customer stock and exchanges were repairs, rather than replacements, because charges to FedEx for those parts were, at maximum, the cost of repair and exchange (invoiced at the time the part was removed from the engine or APU), and the original parts could have been repaired and returned to the engine or APU from which they were removed, but for time constraints.

A part was "replaced," meaning FedEx was charged the market price for the part, only if the part removed from FedEx's engine or APU could not be repaired. (Tr. Mathieson 4/23 at 663; Tr. Clarke 4/23 at 623.) To minimize the cost to FedEx, vendors replaced parts with used serviceable parts, when available, rather than with new parts. (Tr. Mathieson 4/23 at 663)

FedEx was charged for the repairs performed on the parts of the engine or APU that were sent to the vendor. (Tr. Clarke 4/23 at 624.) FedEx did not receive a final invoice for an ESV from the vendor until the vendor had completed repairs on all repairable parts of the engine or APU. (Tr. Clarke 4/23 at 624.)

## D. Relative Cost of ESVs

The cost of ESVs varied from ESV to ESV based on the scope of the maintenance performed and the model of engine or APU at issue. (JPTO ¶ 76.) The costs at issue in this case are the ESV invoice costs. (Tr. Kelley 4/28 at 61–62.)

Trial Exhibit 121 is a materially correct calculation of the average cost of FedEx's ESVs for the listed engine and APU models during TY 1993 and TY 1994. (Tr. Ex. 121; Tr. at 84, 88; Tr. Harvey 4/29 at 66–71.) The average value of FedEx's aircraft during TY 1993 and TY 1994 is accurately represented by Table 10 of the ex-

pert report of ACI Aviation. (Tr. Ex. 107 at 14.) Based on those two sets of data, APU ESV costs ranged between 0.2% and 0.8% of aircraft value, CF6 engine ESV costs ranged between 0.9% and 3.5% of aircraft value, and JT8D engine ESV costs ranged between 2.1% and 8.1% of aircraft value. (Tr. Ex. 121; Tr. Ex. 107). The following chart summarizes these calculations:

| Engine/APU Model | Aircraft Model | Average ESV Cost | Average Aircraft Half–Time Value | ESV Cost as Percentage of Aircraft Half–Time Value |
|---|---|---|---|---|
| JT8D–7B | 727–100 | $ 243,830 | $ 3,000,000 | 8.1% |
| JT8D–15 | 727–200 | $ 432,557 | $ 6,500,000 | 6.7% |
| JT8D–17 | 727–200 | $ 473,960 | $ 6,500,000 | 7.3% |
| JT8D–217 | 727–200REF | $ 301,943 | $14,300,000 | 2.1% |
| CF6–6D | DC–10–10 | $ 710,709 | $20,500,000 | 3.5% |
| CF6–50C2 | DC–10–30 | $1,080,123 | $37,000,000 | 2.9% |
| CF6–80C2 | MD11 | $ 872,912 | $97,500,000 | 0.9% |
| GTCP85 | 727 | $ 51,574 | $ 8,400,000 | 0.6% |
| TSCP700 | DC–10–10 | $ 160,613 | $20,500,000 | 0.8% |
| TSCP700 | DC–10–30 | $ 160,613 | $37,000,000 | 0.4% |
| TSCP700 | MD11 | $ 160,613 | $97,500,000 | 0.2% |

### E. Impact of ESVs on FedEx's Engines, APUs, and Aircraft

When an engine or an APU was removed for an ESV, its value in use to FedEx exceeded its "scrap" value (the value of its parts if the engine or APU were to cease operation). (Tr. Clarke 4/23 at 584–85; Tr. Cukor 4/24 at 799; Tr. Brasie 4/29 at 205.) Although engines were scheduled to be removed at "soft time" thresholds, the engines were not "unserviceable" when they hit those thresholds, and an engine could continue to power an aircraft if the scheduled removal time were inconvenient. (Tr. Tisdale 4/21 at 183–84, 195.) If a "hard-time" threshold had been reached, the engine had to be maintained without delay, regardless of the engine's operability, for the engine to be serviceable. (Tr. Tisdale 4/22 at 279–80.) In some cases an "unserviceable" engine needed only minor repairs to become "serviceable." (Tr. Clarke 4/23 at 584.) Even those engines and APUs that were "inoperable" when they were removed had value in excess of "scrap" value because they were designed to be compatible with a given model of airframes owned by FedEx and had been maintained in accordance with FedEx's maintenance policies. (Tr. Brasie 4/29 at 216–17.)

The ESVs at issue in this case did not restore any engine or APU to "like new" condition. (JPTO ¶ 81.) Because engines and APUs, like all other components of the aircraft, are separately considered during a full appraisal, the value of FedEx's aircraft would have been affected by any increase or decrease in the value of the engines or APUs. (Tr. Brasie 4/29 at 107.) The value of an engine or APU after a given ESV was less than or equal to its value after the previous ESV. (Tr. Ex. 107 at 22–25; Tr. Brasie 4/30 at 54; Tr. Whitehouse 5/20 at 90.) The value of the aircraft after successive ESVs, therefore, either remained stable or declined.

During TY 1993 and TY 1994, FedEx capitalized certain ESVs that are not at issue in this case. (JPTO ¶ 97.) FedEx capitalized ESVs performed on engines or APUs that had not yet been placed in

service or had less than half of the cycles expected until their next ESV because those costs were incurred to put the engines or APUs into service. (JPTO ¶ 97.) FedEx also capitalized an ESV during which a new feature, called a "hush kit," was added to the engine.[6] (JPTO ¶ 97.)

The ESVs at issue in this case did not adapt any engine or APU to a new or different use. (JPTO ¶ 82.) The ESVs at issue in this case did not materially increase the value of FedEx's aircraft, engines, or APUs. The ESVs at issue in this case did not appreciably prolong the lives of FedEx's aircraft, engines or APUs, but merely maintained them in proper working order during their expected useful lives.

## II. Analysis and Conclusions of Law

### A. Applicable Legal Standard

26 U.S.C. § 162 allows taxpayers to deduct ordinary and necessary business expenses paid or incurred during the current taxable year. Treasury Regulation § 1.162–4 (the "Expense Regulation"), which implements 26 U.S.C. § 162, provides in pertinent part: "The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinary efficient operating condition, may be deducted as an expense." Treasury Regulation § 1.263(a)—1(b) (the "Capitalization Regulation"), implementing 26 U.S.C. § 263, restates the same rule from the perspective of the Internal Revenue Code's capitalization requirements.[7] It provides in pertinent part that items are capital expenditures if they "(1) . . . add to the value, or substantially prolong the useful life, of property owned by the taxpayer . . . or (2) . . . adapt property to a new or different use." *Id.* The Capitalization

Regulation further provides that "amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures. . . ." *Id.*

"The distinction between capital expenditures and ordinary and necessary business expenses evades easy description." *Dominion Res., Inc. v. United States,* 219 F.3d 359, 370 (4th Cir.2000) (citing *Jones v. Comm'r,* 242 F.2d 616, 620 (5th Cir. 1957). "Some items are clearly capital and other items are clearly expense, but between the two extremes a point is approached at which it is difficult to determine whether the expenditure is capital or an expense.") *Libby & Blouin, Ltd. v. Comm'r,* 4 B.T.A. 910, 913 (B.T.A.1926). Whether a business expense is capital is highly dependent on the particular circumstances of a given case and is ultimately a factual determination for the trial court. *United Dairy Farmers, Inc. v. United States,* 267 F.3d 510, 519 (6th Cir.2001); *Libby & Blouin, Ltd. v. Comm'r,* 4 B.T.A. at 913.

### B. Unit of Property

When, as in the case at bar, a repair is made to a discrete component part of a larger item of property, the court must determine whether to apply the Repair Regulations to the component part or to the larger item of property. Otherwise stated, the court must identify which "unit of property" is being "repaired" and whether the repair materially adds to the value or appreciably prolongs the life of that unit of property. In the case at bar, the United States suggests that an ESV is a repair of the engine or APU while FedEx contends that an ESV is a repair of the aircraft powered by the engine or

---

6. "Hush kits" made the engines quieter, and their installation was mandated by the FAA. (Tr. Brasie 4/29 at 169.)

7. The court refers to Treasury Regulation § 1.162–4 and Treasury Regulation § 1.263(a)–1(b) collectively as the "Repair Regulations."

APU. Although FedEx and the United States are both strictly correct, the court must identify which is the relevant unit of property under the law.

In *Ingram Indus., Inc. v. Commissioner*, No. 14175–98, 2000 WL 1534755 (U.S.Tax Ct. Oct.18, 2000), 2000 Tax Ct. Memo LEXIS 381, at *1, the court had to determine whether towboat engine maintenance could be deducted under the Repair Regulations. This required the court to determine first whether the towboat engine or the towboat was the appropriate unit of property. *Id.* at *26, 2000 WL 1534755. The court based its decision about whether a towboat engine should be treated separately from a towboat on its analysis of whether "as a matter of industry practice, the engines are purchased or treated separately from the tow boats." *Id.*

In *Ingram*, the court noted first that "a towboat is a very large, integrated item of machinery comprised of a variety of components and systems" and that the "principal part is the propulsion system or engines and drive train." *Id.* at *4, 2000 WL 1534755. Despite the significance of the engines, however, the court determined that, in the towboat industry, engines are not separately appraised and do not have an effect on the market value of the towboat as long as the engines "are operating and are said to have been well maintained." *Id.* at *7, 2000 WL 1534755.

The court found that periodic, significant towboat maintenance generally occurs after the engines have driven the towboat for 25,000 to 35,000 hours—approximately every three to four years. *Id.* at *9, 2000 WL 1534755. So long as that maintenance occurs, the court found that a "towboat's engines can continue operating safely, efficiently and profitably as part of a towboat's main propulsion system for up to 40 years." *Id.* at *8, 2000 WL 1534755. The engine maintenance at issue in *Ingram*

could be performed without the engines' being removed or the towboat being placed in dry dock. *Id.* at *15–16, 2000 WL 1534755.

The court held that the life of the towboat and the lives of its engines were forty years. *Id.* at *26, 2000 WL 1534755. Although the engines could only attain this life by undergoing significant, periodic maintenance, the intent that the engines last the life of the towboat was nonetheless manifest because the engines were acquired with the towboat ("albeit to the buyer's specifications"), they could be maintained without removal from the boat, and the owners did not replace the engines "regularly and periodically" over the towboat's life. *Id.* at *26–27, 2000 WL 1534755.

The unit of property issue was also a factor in *Smith v. Commissioner*, 300 F.3d 1023, 1030 (9th Cir.2002). *Smith* involved the deductibility of the taxpayer's process of relining its aluminum-producing cells as part of the taxpayer's aluminum production operation. *Id.* at 1025. The taxpayer's operation employed 650 cells. *Id.* The cells were spaced 24 to 28 inches apart from each other and were connected by busbars, which allowed the cells to share the same electrical current. *Id.* On average, eight to ten cells were removed at a given time for relining. *Id.* at 1026. The smelting operation could continue with missing cells because the cells were arranged so that the electrical current could bypass a particular cell when necessary. *Id.* at 1025–26. The taxpayer required a minimum of 112 functioning cells to operate its system on a sustained basis. *Id.* at 1026.

The court held that a given cell, and not the entire cell line, was the appropriate unit of property. *Id.* at 1030. In reaching this conclusion, the court found that resolution of the unit of property issue turned

on "whether the realities of [the taxpayer's] smelting operations justify viewing the cells as independent units or constituent parts of a larger whole." *Id.*

In *Smith*, the only "reality" that the court explicitly identified was that the individual cell was capable of producing aluminum if it was not connected to a cell line. *Id.* The trial court had concluded that, although the taxpayer had not set up its line to make this possible, the individual cell had the capability of producing aluminum and was sufficiently free-standing to constitute a separate unit of property. *Id.* In doing so, the court not only rejected the cell line as the unit of property, but also rejected the assertion that the cell lining was the relevant unit of property, presumably because the cell lining was not capable of producing aluminum without the cell. *Id.*

Neither the Tax Court, nor the Ninth Circuit (applying a "clearly erroneous" standard of review), explicitly detailed all of the factors leading to the conclusion that the individual cells were "free-standing." On the facts the Ninth Circuit identified, however, it is clear not only that the individual cells could perform their function without the cell line, but also that the cell line could perform its function with a substantial number of missing cells.

■ Taken together, *Ingram* and *Smith* indicate the factors a court should consider in identifying the appropriate unit of property to which to apply the Repair Regulations. First, the court should consider whether the taxpayer and the industry treat the component part as part of the larger unit of property for regulatory, market, management, or accounting purposes. Second, the court should determine whether the economic useful life of the component part is coextensive with the economic useful life of the larger unit of property. Third, the court should determine whether the larger unit of property

and the smaller unit of property can function without each other. Finally, the court should weigh whether the component part can be and is maintained while affixed to the larger unit of property.

Applying the first factor to the case at bar, the court should consider, as a matter of taxpayer or industry practice, whether the engines and APUs are purchased or treated separately from the aircraft. In *Ingram*, an engine was not considered to have been purchased separately from the vehicle it powers merely because it was separately ordered.

In TY 1993 and TY 1994, The Federal Aviation Administration provided that engines and airframes combined to form a single unit of property. Although the FARs separately defined "airframes" and "aircraft engines," the definition of "airplane" included the airframe (referred to wings) and explicitly referred to the engines. FedEx flew airplanes, not airframes or engines, and thus the definition of an "airplane" is the relevant definition to consider.

Based on the evidence presented at trial, FedEx and other major air carriers considered engines to be part of an aircraft during TY 1993 an TY 1994. Although engines and APUs may be appraised separately, the overwhelming majority of the appraisals performed during and around the period at issue were full appraisals, including engines and APUs as part of the aircraft.

Stand-alone sales of engines and APUs rarely occurred during TY 1993 and TY 1994. Although new engines and APUs were separately manufactured and sold separately from new airframes, the engines and APUs were designed to be compatible with certain airframes, were acquired at the same time as those airframes, and were delivered to FedEx either as part of the completely assembled

aircraft or as spares to fit the specific airframe type being acquired.[8] This acquisition pattern of new engines also translated into infrequent stand-alone sales of used engines and APUs. Because an air carrier acquired a full stock of compatible engines and APUs, as well as other spare parts, when it acquired a given aircraft, the carrier did not need to acquire additional used engines. Likewise, when an air carrier sold a fleet of aircraft, that sale included the engines, APUs, and other spares because the seller no longer had aircraft with which those components would be compatible.

There are distinctions in how FedEx airframes and engines/APUs were maintained, but those distinctions are not so striking as to justify treatment of engines and APUs as units of property separate from the aircraft. Engines/APUs and airframes were governed by different maintenance policies, sent to different vendors, and maintained on different schedules. Although relevant, the significance of these distinctions should not be overstated. The different types of engines and APUs were not handled uniformly either, but were governed by different maintenance policies, sent to different vendors, and maintained on different schedules from one other. Despite differences in maintenance policies and procedures, all parts of the aircraft, including airframes, engines, and APUs, were ultimately governed by a single department (base maintenance) and guided by a unified maintenance plan (MSG–3).

For accounting purposes, FedEx separately allocated for engines (although it did not do so for APUs). These allocations were not made based on true valuations and had no impact on FedEx's income for book or tax purposes. This evidence suggests only that the FedEx accounting department found it convenient to book engines separately from airframes, APUs, and other parts of the aircraft and is not sufficiently significant to justify treating aircraft engines separately from the rest of the aircraft.

■ Based on the foregoing, the substantial weight of the evidence establishes that engines and APUs were treated as part of fully-assembled aircraft for purposes of acquisition, operation, maintenance and disposal. This factor, taxpayer and industry treatment of the property, favors classifying the aircraft as the unit of property for applying the Repair Regulations.

The second factor to consider is whether the expected useful life of an engine or APU, if properly maintained, is co-extensive with the aircraft. Under the *Ingram* approach, if an engine is not "regularly and periodically" replaced over the life of the aircraft, then the useful life of the engine is coextensive with the life of the property that it powers.

The lives of the engines and APUs at issue here were co-extensive with the airframes on which they were mounted. Although the engines and APUs required regular on-wing inspection and maintenance, as well as periodic ESVs, FedEx expected all of their main components to last thirty years.[9] There is no evidence

---

8.  A completely assembled aircraft was always delivered to FedEx. Any spares are in addition to the engines and APU mounted on a given aircraft at the time of delivery.

9.  The United States contends that the economic useful life of a FedEx engine or APU was the period between ESVs. In support of this claim, the United States argues that the level of part replacement in ESVs was such

that the ESVs conferred a new life on the engines and APUs. This contention, however, is based on a false conception of the level of "new" parts replaced during ESVs. The United States did not consider properly the substantial number of installed parts that were not "new," but came from other FedEx engines and would have been reinstalled in those engines but for the need for engine shops to meet FedEx's deadline (known as the

that FedEx participated in the stand-alone engine "market" on more than a rare basis. FedEx did not regularly or periodically replace its engines. FedEx continued to use the engines and APUs it purchased at the time it purchased its aircraft to power those aircraft throughout their useful lives.

The third factor to consider is whether the larger unit of property and the smaller unit of property can function without each other.[10] A tugboat cannot tow barges without its engines, and the engines cannot tow barges without a tugboat. In contrast, the design of the cell line in *Smith* allowed the operation to produce aluminum as long as 112 of 650 cells were installed, and a given cell could produce aluminum without being attached to a cell line. Engines and APUs cannot perform their function of powering jet aircraft unless they are mounted on those aircraft in proper working order. Aircraft cannot fly without engines and APUs.

Finally, the court must consider whether the smaller unit of property must be removed from the larger unit of property for maintenance to occur. In *Ingram*, the court concluded that the towboat was the unit of property in part because the towboat engines were maintained while at-tached to the towboat. The *Smith* court, in reaching the opposite unit of property conclusion, noted that the maintenance of the cell required its removal from the cell line.

In the context of the case at hand, this factor only slightly favors treating the engines and APUs as separate units of property from the airframes. When maintenance was performed on the tugboat engines in *Ingram*, the entire vessel was rendered inoperable. In the case of jet aircraft, in which the engines (and certainly APUS) are a comparatively less significant part of the whole, one of the three engines can be removed, switched with another engine, and sent for an ESV, allowing the aircraft to remain in service while the engine is serviced.

The court notes, however, that there is an important difference between the cells in *Smith* and the engines and APUs in the case at bar: in *Smith*, large numbers of cells could be removed without interfering with the functioning of the cell line. FedEx airplanes, in contrast, require an APU and three working engines to remain in service at all times. In addition, the cells in *Smith* could individually produce aluminum—aircraft engines and APUs separate from the aircraft cannot accomplish their

---

"turn time") for return of an engine or APU. The United States emphasized the testimony of FedEx's expert, Quentin Brasie, who had referred to the time half-way between ESVs as the "half-life" of the engine. The record reflects, however, that "life" used in that context does not refer to the economic useful life of the engine and that any attempt to use the term "half-life" in that context would be inaccurate. Rather, the term "economic useful life" has been precisely defined by ISTAT, the primary appraisal authority in the airline industry, and that definition contemplates periodic ESVs during the useful lives of aircraft, engines, and APUs.

**10.** This factor is similar to the "functional interdependence test" that FedEx has urged the court to adopt. That test, developed in a different context, comes from Treasury Reg. § 1.263A–10(c), and provides that components of property should be treated as a single unit if they are "functionally interdependent." Two items are "functionally interdependent" if "the placing in service of one component is dependent on the placing in service of the other component by the taxpayer or a related person." *Id.* The court declines to adopt the "functional interdependence test" as an absolute test for determining the appropriate unit of property. As *Ingram* and *Smith* make clear, however, functional interdependence is one important factor in determining which unit of property to use in applying the Repair Regulations.

purposes. Although removal indicates that jet aircraft engines and APUs are comparatively more distinct from aircraft than tugboat engines are from tugboats, this factor does not so strongly weigh in favor of an engine's being treated as a separate unit of property that it counterbalances what the other factors indicate: engines and APUs are integrally linked to the aircraft that they power and the aircraft should be considered a single unit of property.[11]

### C. ESVs as "Incidental Repairs"

■ The Repair Regulations allow taxpayers to deduct the cost of "incidental repairs" which do not (1) materially add to the value of the property, (2) appreciably prolong the life of the property, or (3) adapt the property to a new or different use. The United States suggests that the adjective "incidental" creates an independent test of magnitude under which a court could find that an item must be capitalized, separate from the addition of value, the prolongation of life, or the adaptation to a new use. This contention is not supported by the case law.

The United States cites four cases in which it contends courts determined that costs were not deductible because the cost of the repairs was so high relative to the cost of acquisition or the value of the item that the repairs could not be treated as "incidental." Thus, those non-incidental repairs would not be deductible. Although the courts in the cases cited consider the relatively high cost of the repairs at issue, they do not create a separate "incidental" test.

In two of the cases cited by the United States, the courts' holdings were based on a finding that the taxpayer had adapted the property to a new use. In *Dominion*

*Resources, Inc. v. United States,* 219 F.3d 359, 370 (4th Cir.2000), the court held that, after taxpayer had acquired the property, it had incurred substantial environmental cleanup costs "to 'put' the property into a new condition rather than to 'keep' the property in its ordinary efficient condition" and that expenses incurred to "put" property into a new condition must be capitalized. Although the court found that the high cost of the expenditure further supported its finding that the improvements to the property were substantial, the court also noted that the inquiry must focus not on the value of the improvement but on the "nature" of the improvement.

Likewise, in *United Dairy Farmers, Inc. v. United States,* 267 F.3d 510, 519 (6th Cir.2001), the court noted the substantial relative costs of the expenditures as compared with the acquisition cost of the land and contrasted those costs with the relatively lower costs allowed as deductions in *Plainfield–Union Water Co. v. Commissioner,* 39 T.C. 333, 334, 1962 WL 1262 (1962). The court's holding, however, did not depend on a magnitude test or the term "incidental." Rather, the court held that *Plainfield–Union* did not apply "when a taxpayer has improved defects that were present when the taxpayer acquired the property." *United Dairy Farmers,* 267 F.3d at 518–19. Although the expenditures in *United Dairy Farmers* were also different in magnitude, the key difference from the court's perspective was that the expenditures were different in kind—they were incurred to "put" the property in a new condition rather than "keep" it in a given condition. *Id.*

In *Smith v. Commissioner,* 300 F.3d 1023, 1030 (9th Cir.2002), the court, again holding that the expenditure was capital in nature, noted the substantial relative cost

---

**11.** Removability is less significant in determining whether a given component of an aircraft should be deemed a separate unit of property because aircraft are modularized. Smaller components, like landing gear, are also removed for off-aircraft maintenance.

of the expenditure. The court's decision, however, was based primarily on its finding that the cell lining replacement substantially prolonged the cell's life and only secondarily on its finding that the tax court did not err by failing to conclude that the relining expenses did not materially increase the value of the cells. *Id.* at 1033–34. Under the Repair Regulations, the court's finding on the prolongation of life issue would alone have been sufficient to require capitalization. The United States is correct that the *Smith* court found that the cell relining costs were not "incidental," but nothing in *Smith* establishes "incidental" as an independent hurdle or defines "incidental" in terms of the relative costs incurred.[12]

■ The court finds no support for treating "incidental" as a separate capitalization requirement under the Repair Regulations. High cost of repairs relative to acquisition cost or value may be a useful indicator that one of the established capitalization requirements has been met. *See, e.g., LaSalle Trucking Co. v. Comm'r*, No. 94987, 1963 WL 1528 (U.S. Tax Ct. Oct. 7, 1963) 1963 Tax Ct. Memo LEXIS 68(holding that the high cost of replacing substantial components of a truck relative to the truck's acquisition cost made it "difficult to believe that the life of a truck was not extended and its value not increased by the [expenditures].")."Incidental" is not logically read, however, as an independent requirement, but as a description of those improvements that do not increase the value of a specified unit of property, prolong its useful life, or adapt it to a new use.[13]

## D. The Plainfield–Union Test

Engine and APU ESV costs should have been capitalized if they materially added to the value of FedEx's aircraft, appreciably prolonged their life, or adapted them to a new or different use. The United States claims that the court should make this determination by comparing the state of an engine or APU immediately preceding an ESV with the state of that engine or APU immediately following ("fresh" from) that ESV.[14] FedEx contends that the court should follow the test articulated in *Plainfield–Union Water Co. v. Commissioner*, 39 T.C. at 334, under which the court would compare the state of the engine or APU fresh from one ESV with its state fresh from its next ESV.

■ Under the *Plainfield–Union* test, "[a]n expenditure which returns property to the state it was in *before the situation prompting the expenditure arose*, and which does not make the relevant property more valuable, more useful, or longer-lived, is usually deemed a deductible repair." 39 T.C. at 337, 1962 WL 1262 (emphasis added). By a "situation prompting the expenditure," the court refers both to conditions that normally occurred over a period of time, like soil erosion, as well as "relatively sudden, unexpected, or unusual

**12.** As the United States acknowledges, the last case it cited, *Louisville & Nashville R.R. Co. v. C.I.R.*, 641 F.2d 435 (6th Cir.1981), does not involve the Repair Regulations.

**13.** Even if the court were to assume that expenditures must be capitalized if maintenance costs are found to be high in comparison with the value of the property, the record shows that ESV costs are not high relative to the value of the aircraft, ranging from only 0.3% for the TSCP700 APU to 8.1% for the JT8D–7B engine.

**14.** The court has determined that the completely-assembled aircraft is the appropriate unit of property. The court has also found that ESVs do not affect the life or value of an aircraft in a manner different from the way ESVs affect the life or value of the engines and APUs. The court's decision on the unit of property issue does not preclude the court from doing what it must do to assess the effect of ESVs on the completely-assembled aircraft: examine the effect of ESVs on engines and APUs.

occurrences," like oil seepage. *Id.* at 339–41, 1962 WL 1262. The court considers a capital expenditure "to be a more permanent increment in the longevity, utility, or worth of the property" rather than an expenditure intended to correct a "situation." *Id.* at 337, 1962 WL 1262.

The United States, citing *Smith v. Commissioner*, argues that application of the *Plainfield–Union* test (comparing the condition prior to deterioration and the condition after repair or replacement) in all capitalization cases "would permit deductions under § 162(a) for any repair expense, no matter how substantial, since it would always be the case that replacement simply restored the machine to its previous working condition." 300 F.3d at 1034. *Smith*, however, also criticizes the test urged by the United States as invariably requiring that expenditures be capitalized. *Id.* at 1031.

*Smith* does not challenge *Plainfield–Union* generally, but rather, consistent with the fact-specific nature of the capitalization inquiry, *Smith* highlights a situation to which the *Plainfield–Union* approach is ill-suited: the replacement of an essential functional component of the property. The key lesson of *Smith* is that the condition of the property at the time of the expenditure remains relevant. In *Smith*, the court concluded first that the lining had no functional life remaining at the time the cell was relined. *Id.* at 1033. The court then concluded that the cell lining was so critical a component of a cell that "its replacement is tantamount to reconstituting the cell itself." *Id.* at 1033. *Smith* adopted an "essential component" rule to be applied when an essential component of the property is replaced.

Application of the *Smith* "essential component" rule is not justified by the facts of this case.

Unlike the cells in *Smith*, FedEx engines and APUs were not functionally exhausted at the time the engines and APUs were removed for ESVs. When they were removed from the wing, they were often serviceable. Those engines and APUs that were not "serviceable" because they required inspection and cleaning under FAA regulations could often be rendered serviceable by minor repairs.

■ ESVs are more properly classified as repairs, rather than as replacements of essential components of an aircraft. Although essential to an aircraft's functioning, engines and APUs are far less significant than the cell linings in *Smith*, which comprised the entire functioning component of the cell. An aircraft has numerous working parts whose functioning is unrelated to the functioning of the engines and APUs. Engines and APUs are not "essential components" as the term was used in *Smith* because their replacement would not be "tantamount to reconstituting the [airplane] itself."

*Smith*'s essential component rule, furthermore, applies only to the *replacement* of the "essential component." At trial, the United States suggested that the level of part replacement was such that in many ESVS the engine or APU was essentially "replaced." The evidence does not support this contention. In ESVs, most of the parts required only inspection and cleaning or inspection, cleaning, and repair. Although some ESVs involved a substantial number of replacement parts from customer stock or through exchanges of parts, those activities were not true replacements because the parts were repaired and returned to a compatible engine or APU during a later ESV. They could have been returned to the engine or APU from which they were removed but for the vendor's need to meet its deadline. FedEx's invoices appropriately treated these costs as repairs, and the invoice costs are what is at issue in this case.

The court finds the *Plainfield–Union* test to be the appropriate measure of the impact of ESVs on the state of FedEx's aircraft and will apply that test to the facts of this case.[15] In so doing, the court is not departing from the fact-specific nature of its inquiry. The court's duty is to determine whether ESVs are property-enhancing capital expenditures or business expenses incidental to the maintenance of FedEx's aircraft. The need for ESVs was prompted by FedEx's use of its aircraft in transporting packages. As a consequence of powering the aircraft, parts of the aircraft's engines and APU were damaged by general use and by the high temperatures to which their parts were exposed. The *Plainfield–Union* test is most appropriate because the relevant facts of that case are closely analogous. Like the case at bar, *Plainfield–Union* involved similar maintenance (repair rather than replacement) necessitated by a similar condition (damage necessarily sustained in the ordinary course of using the property).

To determine whether the ESVs materially added to the value of FedEx's aircraft, appreciably prolonged their life, or adapted them to a new or different use, the court compares the state of the engines and APUs before the "condition" necessitating an ESV to the state of the engines and APUs "fresh" from an ESV. The "condition" necessitating the ESV was the wear and tear an engine or APU had sustained in powering FedEx's aircraft since a previous ESV. Under this analysis, if an engine or APU is in no better condition after a given ESV than it was after

the preceding ESV, the ESV could not have improved the condition of the aircraft, and the court must conclude that the ESV only corrected the damage sustained by the aircraft during the ordinary course of its operation.

The United States concedes that the ESVs at issue in this case did not adapt the engines or APUs to a new or different use. Because ESVs did not affect the functioning of FedEx's aircraft separately from their effect on the functioning of the aircraft's engines and APUs, this concession also applies to the impact of ESVs on the aircraft. The court, therefore, need only consider the other two components of the Repair Regulations: the impact of ESVs on aircraft value and the impact of ESVs on aircraft life.

If an ESV materially added to the value or appreciably prolonged the life of FedEx's aircraft as compared with the condition of the aircraft immediately following the preceding ESV, the ESV costs should have been capitalized.

■ ESVs did not materially increase the value of FedEx's aircraft. Although the United States challenged FedEx expert Quentin Brasie's testimony that engine and APU values declined over time, the United States's contrary assertion was only that engine and APU values remained relatively flat over time. An engine or APU fresh from an ESV was not worth more than it had been worth immediately following its previous ESV. Because the ESV did not increase the value of the engine or APU, it did not increase the value of the aircraft.

---

**15.** The *United Dairy Farmers* court notes that *Plainfield–Union* is poorly tailored to cases in which the taxpayer acquired the property in a deteriorated condition and incurred costs to "put" the property into service, rather than "keep" the property in service. In that situation, Plainfield–Union would fail to capture improvements. *See United Dairy Farmers,*

267 F.3d at 518–19. The ESVs at issue in this case, however, involve only the costs of keeping the engines and APUs in service, and thus *United Dairy Farmers'* criticism of *Plainfield–Union* would not apply in this context. FedEx did capitalize the cost of ESVs necessary to place its engines and APUs into service.

The ESVs at issue in this case did not appreciably prolong the life of FedEx's aircraft. FedEx acquired its airframes, engines, and APUs with the expectation that they would last over thirty years. FedEx designed its maintenance programs to keep airframes, engines, and APUs in working order throughout their useful lives. The United States has urged the court to find that the ESVs conferred new life on FedEx's engines and APUs, thus prolonging the life of FedEx's aircraft. The United States has supported this contention principally by arguing that the term "half-life" was often used to refer to the time half-way between ESVs. The proof demonstrates, however, that "half-life" in that context referred only to engine maintenance status.

The court in this case is concerned with the economic useful life of FedEx's aircraft, a term precisely defined by ISTAT as: "the period of time over which it is (or is expected to be) physically and economically feasible to operate [aircraft, engines, and APUs] in their intended role. Periodic maintenance and repair will usually be required to preserve safety and efficiency during the economic useful life." FedEx treated each aircraft as a unit. ESVs maintained FedEx's engines and APUs so that they, as part of the aircraft that they powered, could continue to operate for the period of time FedEx had intended. ESVs preserved, but did not prolong, the useful economic life of FedEx's aircraft.

### III. Conclusion and Ultimate Findings of Fact

1) During TY 1993 and TY 1994, FedEx's engines and APUs were so closely linked to the aircraft on which they were mounted that they were part of a single unit of property, the aircraft, for purposes of the Repair Regulations.

2) During TY 1993 and TY 1994, the ESV invoice costs at issue in this case were incurred as ordinary and necessary business expenses incidental to the maintenance of FedEx's aircraft, engines, and APUs and were properly deductible under 26 U.S.C. § 162 and the Repair Regulations.

### IV. Issue Remaining for Phase II

Because the court has concluded that ESV costs incurred by FedEx during TY 1993 and TY 1994 were deductible in full, only one issue remains for Phase II of the trial: the magnitude of the section 481 Adjustment. FedEx and the United States have agreed that evidence pertaining to the section 481 Adjustment would be reserved for Phase II of the trial. The parties further stipulated that, were the court to conclude that the ESV costs at issue were fully deductible, as it now has ruled, the section 481 Adjustment should be set aside in full. The parties, however, have not yet agreed on the correct formula for calculating the section 481 Adjustment. Therefore, should the parties be unable to agree on a formula, the court will, after appropriate Rule 26 disclosures and discovery, conduct Phase II of the trial to resolve this issue.